**[J-59A-2022 and J-59B-2022]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, JJ.**

| | | |
|---|---|---|
| THE BERT COMPANY D/B/A NORTHWEST INSURANCE SERVICES | : | No. 13 WAP 2022 |
| | : | |
| | : | Appeal from the Order of the |
| | : | Superior Court entered May 5, 2021 |
| v. | : | at No. 817 WDA 2019, affirming the |
| | : | Judgment of the Court of Common |
| | : | Pleas of Warren/Forest County |
| MATTHEW TURK, WILLIAM COLLINS, | : | entered June 3, 2019 at No. AD 260 |
| JAMIE HEYNES, DAVID MCDONNELL, | : | of 2017 |
| FIRST NATIONAL INSURANCE AGENCY, | : | |
| LLC, FIRST NATIONAL BANK, AND FNB | : | ARGUED: October 25, 2022 |
| CORPORATION | : | |
| | : | |
| | : | |
| APPEAL OF: MATTHEW TURK, FIRST | : | |
| NATIONAL INSURANCE AGENCY, LLC, | : | |
| FIRST NATIONAL BANK, AND FNB | : | |
| CORPORATION | : | |
| | : | |
| | : | |
| THE BERT COMPANY D/B/A NORTHWEST INSURANCE SERVICES | : | No. 14 WAP 2022 |
| | : | |
| | : | Appeal from the Order of the |
| | : | Superior Court entered May 5, 2021 |
| v. | : | at No. 975 WDA 2019, dismissing as |
| | : | moot the cross-appeal from the |
| | : | Judgment of the Court of Common |
| MATTHEW TURK, WILLIAM COLLINS, | : | Pleas of Warren/Forest County |
| JAMIE HEYNES, DAVID MCDONNELL, | : | entered June 3, 2019 at No. AD 260 |
| FIRST NATIONAL INSURANCE AGENCY, | : | of 2017 |
| LLC, FIRST NATIONAL BANK AND FNB | : | |
| CORPORATION | : | ARGUED: October 25, 2022 |
| | : | |
| | : | |
| MATTHEW TURK | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |

THE BERT COMPANY, NORTHWEST :
BANK, AND NORTHWEST :
BANCSHARES, INC. :
  :
  :
  :
APPEAL OF: MATTHEW TURK, FIRST :
NATIONAL INSURANCE AGENCY, LLC, :
FIRST NATIONAL BANK, AND FNB :
CORPORATION

**OPINION**

**JUSTICE DONOHUE**                                              **DECIDED: JULY 19, 2023**

In this appeal by permission, we consider the application of jurisprudence of the United State Supreme Court[1] addressing the constitutionality of an award of punitive damages[2] by a civil jury in this Commonwealth.[3] We specifically address the ratio calculation first discussed in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), and developed in *State Farm Mutual Automobile Ins. Co. v. Campbell*, 538 U.S. 408 (2003). Our grant of allowance of appeal narrowly encompasses the appropriate ratio calculation measuring the relationship between the amount of punitive damages awarded

---

[1] *Pacific Mutual Life Insurance v. Haslip*, 499 U.S. 1 (1991), *TXO Product Corp. v. Alliance Resources Corp.*, 509 U.S. 443 (1993), *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), and *State Farm Mutual Automobile Ins. Co. v. Campbell*, 538 U.S. 408 (2003).

[2] "Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty" that may be imposed. *Gore*, 517 U.S. at 574. Accordingly, "[t]he Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *State Farm*, 538 U.S. at 416. *Accord Haslip*, 499 U.S. 1; *TXO*, 509 U.S. 443.

[3] This is the first time we consider any aspect of a challenge to excessiveness of a punitive damages award since the High Court's decision in *Haslip*.

against multiple defendants who are joint tortfeasors and the compensatory damages awarded. The ratio is one of the considerations in assessing whether an award of punitive damages is unconstitutionally excessive.

The Superior Court calculated the punitive to compensatory damages ratio using a per-defendant approach, as calculated by the trial court, which resulted in ratios ranging from 1.81 to 1 to 6 to 1, rather than a per-judgment approach, which resulted in a ratio of 11.2 to 1. For the reasons discussed, we generally endorse the per-defendant approach as consistent with federal constitutional principles that require consideration of a defendant's due process rights. Further, we conclude that under the facts and circumstances of this case, it was appropriate to consider the potential harm that was likely to occur from the concerted conduct of the defendants in determining whether the measure of punishment was both reasonable and proportionate. Thus, we affirm the order of the Superior Court.

## BACKGROUND

The Bert Company, dba Northwest Insurance Services ("Northwest"), is an insurance brokerage firm with clientele in northwestern Pennsylvania and western New York. In 2017, Northwest realized gross earnings of $9.4 million. Beginning in 2005, Matthew Turk ("Turk") was employed as an insurance broker with Northwest. In 2009, he became head of the property and casualty division, and then worked as senior vice president of that division from January 2013 until his departure in May 2017. First National Insurance Agency, LLC ("FNIA") is an insurance brokerage firm. FNB Corporation is the parent company of First National Bank ("FNB") and FNIA (collectively and with FNIA "First National").

In 2016, FNIA had only a minor market share in northwestern Pennsylvania. To grow its business in that region, First National developed a plan to takeover Northwest, initially by convincing key Northwest employees to leave Northwest for FNIA and to bring their clients with them. These employees were under non-solicitation agreements with Northwest. First National initiated this plan,[4] which it referred to as a "lift out," beginning in the fall of 2016 by covertly meeting with Turk. The ultimate goal, however, was not only the acquisition of certain key employees and their books of business but the takeover of Northwest at a fire sale price.[5]

Through the fall and winter of 2016, Turk repeatedly met with First National about the plan with the hope that First National could gut Northwest by hiring the bulk of its highest producers, acquiring their clients, and ultimately forcing that company to sell its remaining book of clients to First National. This course of conduct included Turk providing First National with sensitive pieces of Northwest's data, such as his book of business and a list of profitable employees that Turk believed would be willing to leave Northwest to work for First National. Turk's interactions with First National included various correspondence with two Senior Vice Presidents of FNB regarding the plan to raid Northwest.

---

[4] First National "affectionately referred" to the plan as "Project Green Goblin." Trial Court Opinion on Post-Trial Motions for Relief, 4/29/2019, at 12 (citing Plaintiff's Trial Exhibit 174).

[5] Our factual summary is based in part on the reporting of the Superior Court which, pursuant to its standard of review of the denial of post-trial motions, views the evidence and all reasonable inferences therefrom in the light most favorable to the verdict winner. *Bailets v. Pa. Turnpike Comm'n*, 181 A.3d 324, 332 (Pa. 2018). For a detailed account of the evidentiary background in this case, see *The Bert Co. v. Turk*, 257 A.3d 93 (Pa. Super. 2021). Based on our de novo review, the facts reported by the Superior Court are supported by the record unless otherwise indicated.

During this time, Turk and William Collins, a Northwest employee who Turk put in contact with First National, forwarded their non-solicitation/non-disclosure agreements to First National for review.[6] Thereafter, Turk asked Northwest for a new agreement to reduce his restrictive period from three years to one year. Unaware of the takeover plan, Northwest provided a new agreement to Turk, which he signed on February 16, 2017 ("NSND Agreement").[7]

Correspondence and multiple meetings occurred among various representatives of First National and Northwest employees regarding the takeover of Northwest; all the while Turk attempted to undermine Northwest's operations. For example, in May 2017, Northwest held a staff retreat where Turk was charged with overseeing a session regarding a new software program. Rather than covering that topic, Turk "furthered [First National's] plan to create discontent among [Northwest's] employees by opening the floor for grievances." *The Bert Co. v. Turk*, 257 A.3d 93, 106 (Pa. Super. 2021). Two days after the retreat, Turk and Jamie Heynes ("Heynes"), another Northwest employee covertly participating in the plan, met with Linda Wallin ("Wallin"), an account manager at another agency who was planning to join Northwest where she would have reported to Turk. They informed Wallin that they were leaving Northwest for FNIA and encouraged

---

[6] According to expert testimony at trial, the *pro forma* analysis prepared by FNB showed the value of the lift out of Turk and Collins by FNIA to be $5.3 million. N.T., 12/17/2018, at 231–32.

[7] Relevant to this appeal, the NSND Agreement disallowed Turk from recruiting Northwest employees for twelve months after the termination of his relationship with Northwest. NSND Agreement, 2/16/2017, ¶ 8(a). It further rendered Turk responsible for Northwest's reasonable attorney's fees and costs in the event that Northwest needed to initiate a court action to enforce the agreement. *Id.* ¶ 8(d)(ii). Post-trial, the trial court awarded Northwest $361,093.74 in attorneys fees and costs. The award was affirmed by the Superior Court and is not implicated in this appeal.

her to join FNIA instead of Northwest. The efforts of Turk and Heynes were successful. Although Turk was directly responsible for Wallin's employment by FNIA, Wallin was instructed to advise him in writing of her decision to join FNIA in order to conceal Turk's involvement in her decision to forego employment with Northwest.

Toward the middle of May 2017, the plan began to come to fruition as several Northwest employees resigned and accepted offers from First National. Pursuant to the plan, Turk remained at Northwest to convince the company to sell its remaining business to First National. Northwest refused, choosing instead to fire Turk and initiate legal action.

Northwest initially sued several of its ex-employees, including Turk and William Collins, alleging breach of their NSND Agreements. The trial court issued an injunction barring the ex-employees from soliciting or servicing Northwest customers and from soliciting other Northwest employees to leave the company. Northwest then filed an amended complaint, adding First National as defendants and seeking compensatory and punitive damages. In addition, Northwest asserted: (1) breach of contract and fiduciary duties and theft of trade secrets against its ex-employees; (2) unfair competition against First National; and (3) misappropriation of trade secrets, tortious interference with contract, and civil conspiracy against Turk and First National.

The case proceeded to a jury trial on December 10, 2018, resulting in verdicts on December 21, 2018 against Turk, FNIA, FNB, and FNB Corporation (collectively the "Defendants"). The jury found Turk liable for breach of contract, breach of fiduciary duty,

and civil conspiracy; it found First National liable for civil conspiracy and unfair competition. The jury awarded Northwest compensatory damages[8] as follows:

| | |
|---|---|
| **Turk** | Breach of Contract, $164,943[9] |
| | Breach of Fiduciary Duty, $90,000 |
| **Turk, FNB Corp., FNB, FNIA** | Civil Conspiracy, $164,943 |
| **FNB Corp., FNB, FNIA** | Unfair Competition, $250,000 |

The trial court instructed the jury that Northwest would receive only the largest award of any compensatory damages and that Northwest could not recover on each theory separately. Trial Court Opinion on Post-Trial Motions for Relief ("PTM Opinion"), 4/29/2019, at 14 (citing N.T., 12/20/2018, at 180).[10] The verdict slip also reflected this instruction.[11] The largest compensatory damages award for which Turk and First National

---

[8] According to the trial court, the amount of compensatory damages awarded by the jury "[was] not only reasonable, but mirror[ed] very closely the testimony of the expert witnesses." Trial Court Opinion on Post-Trial Motions for Relief, 4/29/2019, at 19.

[9] This was "the exact amount of Defendant Turk's salary." Trial Court Opinion on Post-Trial Motions for Relief, 4/29/2019, at 19.

[10] This instruction was based on the agreement of all parties and was the result of a mutual request by counsel to the trial court. N.T., 12/19/2018, at 283; N.T., 12/21/2018, at 16.

[11] Under each claim on the agreed-upon verdict slip, the jury was instructed to first determine which, if any, of the Defendants were liable to Northwest. If liability was found, the jury was instructed to determine the amount of damages suffered by Northwest caused by the Defendants cumulatively as a result of the liability under the claim. In other words, the compensatory damages award was entered as a lump sum and not allocated among the liable Defendants. As to each award of damages, the following instruction appeared:

> Note to jurors: While you may choose to award Northwest Insurance Services damages on this claim and any others, Northwest Insurance Services will only be permitted to recover once for the same injury. Therefore, if you choose to award Northwest Insurance Services damages on this claim

(continued…)

were jointly and severally liable was $164,943 (civil conspiracy). The largest compensatory damages award for which First National was jointly and severally liable was $250,000 (unfair competition).[12] The jury also awarded a total of $2.8 million in punitive damages, imposed per-defendant as follows:

**Turk**  Breach of Contract & Fiduciary Duty, Civil Conspiracy $  300,000

**FNB Corp.**  Civil Conspiracy and Unfair Competition  $  500,000

**FNB**  Civil Conspiracy and Unfair Competition  $  500,000

**FNIA**  Civil Conspiracy and Unfair Competition  $1,500,000

Northwest and the Defendants filed post-trial motions, challenging, inter alia, the compensatory and punitive damages awards. The trial court denied the post-trial motions,[13] but it granted Northwest's request to assess Turk with attorney's fees pursuant

---

and any others, it will collect the largest sum awarded on any particular claim (but not any other lesser or equal sums awarded), together with whatever amount of punitive damages you award below, if any.

Verdict Slip, 12/21/2018, at 2, 3, 5, 7, 8, and 10. Except for the claims for breach of contract and misappropriation of trade secrets, in addition to the foregoing instructions, the jury was instructed to answer whether any of the Defendants were liable for punitive damages and, if so, with respect to any such defendant, in what amount. In other words, the jury was instructed to award a specific amount of punitive damages individually against each of the Defendants it found liable for punitive damages.

[12] This finding is relevant in determining the ratio of punitive to compensatory damages for the claim of constitutional excessiveness. Northwest's recovery against Turk was capped at $164,943, and its recovery against First National was capped at $250,000. How that award is ultimately allocated for payment among the Defendants is not relevant to our analysis.

[13] According to the trial court, "[t]he gloating emails between the First National Defendants prove[] that there was malicious intent with their plan to lift-out key employees. …[T]he fact that First National Defendants are still trying to claim that their only motivation for recruiting the Individual Defendants was for their particular skills and gifted abilities is incredulous [sic]." PTM Opinion, 4/29/2019, at 16–17.

to his NSND Agreement. After the entry of judgment against the Defendants, all parties appealed to the Superior Court.

A majority of a three-judge panel of the Superior Court affirmed the judgment in a published opinion. *The Bert Co. v. Turk*, 257 A.3d 93 (Pa. Super. 2021). The Defendants raised seven issues, the one relevant to the instant appeal being a challenge to the constitutionality of the jury's award of punitive damages to Northwest. The Defendants argued that the Due Process Clause of the Fourteenth Amendment to the United States Constitution[14] prohibits, as grossly excessive, the punitive damages assessed against them on the grounds that the aggregate ratio of punitive to compensatory damages in this case was 11.2 to 1, resulting in an award of punitive damages that was unconstitutionally excessive. In advancing this as the appropriate ratio, the Defendants argued that the federal constitution required the trial court to cumulate all the punitive damages that the jury imposed and use that total as the numerator in its ratio calculation. *Id.* at 119.

In reviewing this claim, the Superior Court observed that the trial court had rejected the Defendants' math, explaining that the trial court computed the ratio using the amount of the punitive damages assessed against each of the Defendants compared to the compensatory damage imposed on that defendant. This resulted in ratios of 1.8 to 1 for Turk; 2 to 1 for FNB; 2 to 1 for FNB Corporation; and 6 to 1 for FNIA. *The Bert Co.*, 257 A.3d at 118–19 (citing PTM Opinion, 4/29/2019, at 25). Using this per-defendant approach, the trial court concluded that the ratios would be constitutionally sound under

---

[14] The Due Process Clause provides that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1 (1868).

*State Farm* and further, under the facts and circumstances of this case, "the punitive damages are not so outrageous as to shock the trial court's conscience." *The Bert Co.*, 257 A.3d at 119 (citing Trial Court PTM Opinion, 4/29/2019, at 25).[15]

The Superior Court explained that punitive damages serve the important state interest of deterring and punishing egregious behavior. *The Bert Co.*, 257 A.3d at 119. As to the "historical context of punitive damages generally" and federal constitutional case law pertaining to punitive damages awards, the court observed that, in *Pacific Mutual Life Insurance v. Haslip*, 499 U.S. 1 (1991),[16] the Supreme Court of the United States determined that the Fourteenth Amendment limits punitive damages based on "general concerns of reasonableness"; however, the High Court did not "draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case." *The Bert Co.*, 257 A.3d at 120–21 (quoting *Haslip*, 499 U.S. at 18-19). Indeed, the Superior Court noted that the High Court affirmed punitive damages that exceeded the compensatory award by 526 times in *TXO Product Corp. v. Alliance*

---

[15] In its opinion addressing Defendants' post-trial motions, while endorsing the single-digit ratios based on the per-defendant approach, the trial court suggested—without discussion—that the global ratio of 11.2 to 1 "could obviously be considered an award 'exceeding a single-digit ratio…to a ***significant degree***.'" PTM Opinion, 4/29/2019, at 24 (emphasis in original). Subsequently, in its Pennsylvania Rule of Appellate Procedure 1925(a) opinion, the trial court stated: "While the individual ratios clearly fall within the single-digit ratio explained in *State Farm*, the global ratio only slightly exceeds this standard." Trial Court Opinion, 8/6/2019, at 4. By way of explanation for its change of position, the trial court stated that because "there is no explicit ratio that a punitive damages award may not surpass and the punitive damages in this case are not so outrageous as to shock the [c]ourt's conscience, the jury's award stands." *Id.*

[16] *Haslip* involved a jury award of $200,000 in compensatory damages and $840,000 in punitive damages after an insurance agent misappropriated premiums while acting within the scope of his apparent authority as an agent of the plaintiff's insurer.

*Resources Corp.*, 509 U.S. 443 (1993).[17] Also refusing to draw a mathematical bright line between constitutionally acceptable and unacceptable amounts of punitive damages, the *TXO* plurality stated that a factfinder may impose punitive damages that have a "reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that actually has occurred." *The Bert Co.*, 257 A.3d at 121 (quoting *TXO*, 509 U.S. at 460).

The Superior Court next addressed *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), wherein the High Court vacated a punitive damages award.[18] In so doing, the Court provided three "guideposts" for determining whether a punitive damages award is grossly excessive: "(1) the degree of reprehensibility of defendant's conduct; (2) the relationship of the punitive verdict to the harm or potential harm suffered by the victim; and (3) any sanctions for comparable misconduct in statutory or decisional law." *The Bert Co.*, 257 A.3d at 121 (citing *Gore*, 517 U.S. at 574, 583, & 585). The Superior Court observed that the *Gore* rationale was refined in *State Farm*, 538 U.S. 408 (2003).[19]

---

[17] *TXO* involved a jury award of $19,000 in actual damages and $10 million in punitive damages after TXO acted in bad faith to advance a claim against the holder of good title to oil and gas development rights in order to renegotiate royalty arrangements with the holder.

[18] *Gore* involved a jury award of $4,000 in compensatory damages and $2,000,000 in punitive damages after an American distributor of a foreign automobile manufacturer failed to disclose that a purchaser's automobile had been repainted after being damaged prior to delivery.

[19] *State Farm* involved a jury award of $2.6 million in compensatory damages (almost entirely for emotional distress) and $145 million in punitive damages after State Farm failed to settle an underlying automobile insurance claim within policy limits. *State Farm*, 538 U.S. at 415. In *State Farm*, the Supreme Court targeted the reprehensibility guidepost, clarifying that only the defendant's conduct that harmed the plaintiff is relevant to that indicium of excessiveness and not the conduct of the defendant in other jurisdictions. *Id.* at 419–20.

Specifically, *State Farm* "expounded on the first guidepost (degree of reprehensibility) and instructed courts to consider five factors" in examining this criterion, namely, whether

> (1) the harm caused was physical as opposed to economic;
>
> (2) the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others;
>
> (3) the target of the conduct was vulnerable;
>
> (4) the conduct involved repeated actions or was an isolated incident; and
>
> (5) the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*The Bert Co.*, 257 A.3d at 121-22 (citing *State Farm*, 538 U.S. at 419-20).

Regarding the second *Gore* guidepost (the relationship of the punitive verdict to the harm or potential harm suffered by the victim), the Superior Court explained that *State Farm* reiterated there is no bright-line ratio for determining whether an award of punitive damages meets constitutional muster. However, it opined that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *The Bert Co.*, 257 A.3d at 122 (quoting *State Farm*, 538 U.S. at 425). In concluding its summary of the High Court's precedent in this area, the Superior Court expressed that, "[l]ike any substantive-due-process inquiry then, the issue is whether the jury's award of punitive damages is reasonable under the facts." *Id.*

The Superior Court then turned its attention to determining how to calculate the punitive to compensatory damages ratio when multiple defendants are involved in a verdict. In so doing, the Superior Court initially rejected the Defendants' suggestion that the alleged 11.2 to 1 punitive to compensatory damages ratio is grossly excessive as a matter of law. In support of this conclusion, the court reiterated that the High Court has repeatedly declined to draw a bright-line ratio that punitive damages cannot exceed.

Next, the Superior Court discussed at length whether the trial court correctly calculated the punitive to compensatory damages ratio in this case, which obviously involved multiple defendants, a scenario never addressed by the United States Supreme Court. According to the Superior Court, the issue of how to calculate the damages ratio among multiple defendants also presented an issue of first impression in Pennsylvania. *The Bert Co.*, 257 A.3d at 124. After surveying precedent from various state and federal courts, the Superior Court ultimately found persuasive the combined reasoning of the United States Court of Appeals for the Ninth Circuit in *Planned Parenthood of Columbia/Willamette Inc. v. American Coalition of Life Activists*, 422 F.3d 949 (9th Cir. 2005), and the Supreme Court of Texas in *Horizon Health Corp. v. Acadia Healthcare Co., Inc.*, 520 S.W.3d 848 (Tex. 2017).

The Superior Court recounted that, in *Planned Parenthood*, the Ninth Circuit adopted the formula proposed by Northwest and employed by the trial court in this case, i.e., the Ninth Circuit's "math compared each plaintiff's individual compensatory damages and punitive damages awards as to each defendant." *The Bert Co.*, 257 A.3d at 125 (internal quotation marks and citation omitted). The Superior Court explained that the "Ninth Circuit found this defendant-by-defendant approach 'more accurately reflects the true relationship between the harm for which a particular defendant is responsible, and the punitive damages assessed against that defendant.'" *Id.* (quoting *Planned Parenthood*, 422 F.3d at 961).

The Superior Court noted that the Texas Supreme Court reached the same result in *Horizon Health*. In so doing, the Texas Supreme Court stated that the "proper basis for assessing the constitutional excessiveness of an exemplary-damages award[20] is per-

---

[20] "Exemplary damages" is another, ancient term for the damages a jury awards that "exceed the amount necessary to compensate the plaintiff for his actual pecuniary loss. The additional sum was … justified as serving various purposes: punishment, deterrence, (continued…)

defendant rather than per-judgment." *The Bert Co.*, 257 A.3d at 128 (quoting *Horizon Health*, 520 S.W.3d at 877). The Texas Supreme Court further expressed that this "approach is also consistent with the underlying purpose and focus of exemplary damages—to punish the wrongdoer rather than to compensate the claimant." *Horizon Health*, 520 S.W.3d at 877.

After adopting the per-defendant ratio, the Superior Court stated that the ratio guidepost, i.e., the second *Gore* guidepost, "is not **strictly** a compensatory-to-punitive-damages question." *The Bert Co.*, 257 A.3d at 128 (emphasis in original). Rather, the court opined, "that guidepost can also consider the '**potential** harm' a plaintiff could have suffered due to the defendant's misconduct." *Id.* (citing *Gore*, 517 U.S. at 575) (emphasis in original). According to the Superior Court, "*Gore* indicates that, in addition to the amount of harm inflicted, the Due Process Clause allows juries to impose punitive damages based on the **potential** damage that defendants wantonly risked or intentionally sought to inflict on a plaintiff." *Id.* (emphasis in original). The court reasoned that "[f]actoring potential harm into the calculus is well-suited where defendants demonstrate knowledge that an act or omission is unlawful, yet deliberately break the law. This is particularly so where, as here, the tort is perpetrated with a desire to injure the plaintiff." *Id.* at 129.

The Superior Court then reviewed the evidence of record which the court concluded clearly demonstrated that the Defendants intended to do as much economic damage as possible to Northwest, "to the point of forcing [Northwest] into sacrificing its entire staff and book of business to the First National Family." *The Bert Co.*, 257 A.3d at

_____

assessing the degree of reprehensibility of the defendant's conduct, and recording the jury's sense of moral outrage as an expression of societal norms." *See* Andrew W. Marrero*, Punitive Damages: Why the Monster Thrives*, 105 Geo. L.J. 767, 777 (2017) (citing *Wilkes v. Wood*, 98 Eng. Rep. 489 (1763), and *Huckle v. Money*, 95 Eng. Rep. 768 (1763)).

129. Indeed, the court noted, immediately after the Defendants set their plan into motion, numerous clients left Northwest for FNIA, forcing Northwest to obtain an injunction against its former employees and FNIA. According to the Superior Court, if Northwest would not have obtained this injunction, then the actual damages to Northwest would have been far worse than the jury found. Thus, in the Superior Court's view, the potential harm that the Defendants wished to inflict on Northwest substantially exceeded the award of $250,000 in compensatory damages. In fact, the court concluded, the Defendants intended to inflict upon Northwest potential harm equal to the value of the company. The Superior Court found that, under *Gore*, the jury had the right to punish the Defendants' "attempt to steal a corporation" with an estimated worth of at least $9.4 million. *The Bert Co.*, 257 A.3d at 132. The court asserted that the harm the Defendants inflicted upon Northwest, $250,000, and the remaining value of the company, $9,150,000, "combine for a punitive-damage [ratio] denominator of $9,400,000." *Id.*

The Superior Court reiterated that the jury imposed punitive damages of $300,000 against Turk, $1.5 million against FNIA, $500,000 against First National Bank, and $500,000 against FNB Corporation; thus, these defendant-specific awards of punitive damages "pale in comparison to the staggering, **potential** harm that they all wanted to inflict on [Northwest]." *The Bert Co.*, 257 A.3d at 132 (emphasis in original). The court then stated that "the punitive-damages-to-potential-harm ratios, per-defendant, are significantly less than even a one-to-one ratio. They are as follows: a one-to-31.333 ratio for Mr. Turk, a one-to-6.266 ratio for FNIA, and a one-to-18.8 ratio for First National Bank and F.N.B. Corp." *Id.* Ultimately concluding that the Defendants' constitutional claim was "frivolous," the court opined, "Given the total disregard for the rule of law that [the Defendants] displayed, the punitive damages that the jury awarded are **light years away** from the outer limits of the Due Process Clause." *Id.* (emphasis in original).

Senior Judge Colins authored a concurring and dissenting opinion. *The Bert Co.*, 257 A.3d at 133-42 (Colins, S.J., concurring and dissenting). As to the constitutional claim regarding the punitive damages award, Judge Colins explained that, because he concluded that FNB and FNB Corporation were entitled to JNOV on the claims rendered against them "and that only the $300,000 punitive damage award against Turk and $1.5 million punitive damage award against FNIA should remain, the ratio of the total legally valid punitive damages awards, $1.8 million, to the $250,000 in compensatory damages is 7.2 to 1, significantly less than 10 times the compensatory award." *Id.* at 141. Consequently, Judge Colins found it unnecessary to consider the constitutional "validity of a $2.8 million punitive damages award in this case or to address the majority's analysis of whether the punitive damages awards may be separately analyzed for each defendant without considering their cumulative effect[.]" *Id.*

Judge Colins rejected, however, the Defendants' contention that, because the compensatory damages award was substantial, any ratio of punitive to compensatory damages above 2 to 1 is unconstitutionally excessive as a matter of law.[21] In so doing, Judge Colins observed that, in *State Farm*, the High Court ultimately held that "because there are no rigid benchmarks that a punitive damages award may not surpass, ratios greater than those we have previously upheld may comport with due process where a particularly egregious act has resulted in only a small amount of economic damages." *The Bert Co.*, 257 A.3d at 141 (Colins, J., concurring and dissenting) (quoting

---

[21] The 2 to 1 ratio argued by the Defendants was based on two Superior Court cases affirming the award of punitive damages that were two times the amount of the compensatory damages awards in those cases. *See Reading Radio, Inc. v. Fink*, 833 A.2d 199 (Pa. Super. 2003) (upholding punitive to compensatory damages ratio of slightly more than 2 to 1), and *B.G. Balmer & Co. v. Frank Crystal & Co.*, 148 A.3d 454 (Pa. Super. 2016) (upholding punitive to compensatory damages ratio of 1.88 to 1). The majority rejected reliance on these cases because, inter alia, no ratio calculation analysis was performed in either case. *The Bert Co.*, 237 A.3d at 123.

*State Farm*, 538 U.S. at 425) (internal quotation marks omitted). Judge Colins then highlighted that, while Northwest suffered only $250,000 in compensatory damages, "the amount of business that FNIA and Turk sought to make Northwest lose was at least $1.3 million."[22] *Id.* at 141 (citing N.T. Trial, 12/11/2018, at 51). Without including the awards against FNB and FNB Corporation, Judge Colins suggested, the "amount of the total punitive award, $1.8 million, while high in comparison to Northwest's actual loss, is not extraordinary in comparison to the harm and gain that FNIA and Turk sought from their conduct." *Id.* In Judge Colins' view, "[g]iven these facts, a 7.2 to 1 ratio of punitive damages to compensatory damages is not unconstitutional under the decisions of the United States Supreme Court or our courts." *Id.* at 141-42 (citing *Empire Trucking Co. v. Reading Anthracite Coal Co.*, 71 A.3d 923, 938-39 & n.3 (Pa. Super. 2013) (holding, without substantive analysis or citation to federal guidepost precedent, that $1.5 million punitive damages award was not unconstitutionally disproportionate to $271,000 compensatory damages award in business tort case where ratio was 5.6 to 1)).[23]

---

[22] This amount is the sum of Turk's $900,000 book of business and William Collins' $400,000 book of business. N.T., 12/11/2018, at 51.

[23] We note that the Superior Court has addressed other claims of excessive punitive damages awards in cases that involved one defendant. *See, e.g.*, *Hollock v. Erie Ins. Exchange*, 842 A.2d 409 (Pa. Super. 2004) (affirming 10 to 1 ratio in bad faith case based on egregiousness of insurer's conduct, defendant's wealth, and *State Farm*'s exception to single-digit ratio where low compensatory damages are awarded); *Grossi v. Travelers Personal Ins. Co.*, 79 A.3d 1141 (Pa. Super. 2013) (affirming 4 to 1 ratio in bad faith case based on reprehensibility of insurer's conduct, *State Farm*'s exception to single-digit ratio where low compensatory damages are awarded, and comparison to higher ratio affirmed in *Hollock*). *Cf. B.G. Balmer*, 148 A.3d 454 (affirming in two sentences singular punitive damages award of $4.5 million and compensatory damages award of $2.4 million, which yielded ratio of 1.88 to 1, in business tort case based on outrageousness of individual and corporate defendants' conduct and *State Farm* language favoring single-digit ratios).

*See also Reading Radio*, 833 A.2d 199 (affirming punitive damages awards of $5,000 against individual defendant and $800,000 against corporate defendants and single compensatory damages award of $300,000, which yielded ratios of .016 to 1 and 2.67 to 1, in business tort case based on outrageousness of defendants' conduct and *State Farm* (continued…)

The Defendants filed a petition for allowance of appeal, which we granted on the following questions:

1. Whether in cases involving joint and several liability−where compensatory damages are awarded, cumulatively, against all defendants and not on an individualized basis−the constitutionally permissible ratio of punitive-to-compensatory damages is calculated on a per-judgment basis and not a per-defendant basis?

2. Whether, in reviewing the constitutionality of a punitive damages award, a court cannot consider the speculative potential harm that the plaintiff could have suffered and introduce it as a *post hoc* justification for the award, especially when the plaintiff did not present evidence of potential harm to the jury?

3. Whether, in cases where the compensatory damages award is substantial, a punitive-to-compensatory damages ratio exceeding 9:1 is presumptively unconstitutional under U.S. Supreme Court precedent?

*The Bert Co. v. Turk*, 275 A.3d 958 (Pa. 2022) (reordered).

## DISCUSSION

### I.      Scope and Standard of Review

A challenge to the constitutionality of a punitive damages award triggers de novo review.  *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 436 (2001).  An appellate court should, however, adhere to the trial court's findings of fact unless they are clearly erroneous.  *Id.* at 440 n.14 (citing *United States v. Bajakajian*, 524 U.S. 321, 336–37 n.10 (1998)).  The issues accepted for review involve deciding the appropriate calculation of the ratio of punitive to compensatory damages pursuant to the second *Gore* factor where the defendants are jointly and severally liable under Pennsylvania law, and

language favoring single-digit ratios).  *Reading Radio* involved multiple defendants, a single compensatory damages award, and separate punitive verdicts.  The court employed the per-defendant approach used by the lower court in the case at hand.

the circumstances under which potential harm to a plaintiff can be considered. The issues present questions of law, and our scope of review is plenary. *Dooner v. DiDonato*, 971 A.2d 1187, 1193 (Pa. 2009).

## II. Legal Background

The focal point of this appeal is the relationship between compensatory and punitive damages. Compensatory and punitive damages are typically awarded at the same time by the same decisionmaker, but they serve distinct purposes. *Leatherman*, 532 U.S. at 432. The distinguishing feature of compensatory or actual damages is that they serve "to compensate for a proven injury or loss." *Damages*, Black's Law Dictionary (10th ed. 2014). Compensatory damages "are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct." *Leatherman*, 532 U.S. at 432 (2001); *State Farm*, 538 U.S. at 416. To that end, compensatory damages may include not only out-of-pocket loss and other monetary harms, but also such injuries as "impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering." *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986) (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350 (1974)). Given their purpose, "compensatory damages are measured by the harm the defendant has caused the plaintiff." *Philip Morris USA v. Williams*, 549 U.S. 346, 358 (2007).

"Punitive damages have long been a part of traditional state tort law." *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 255 (1984). The common-law method for assessing punitive damages has been recognized in every state and federal court for over two hundred years—since before enactment of the Fourteenth Amendment in 1868. *Day v. Woodworth*, 54 U.S. 363 (1852); *Haslip*, 499 U.S. at 17. Punitive damages "are aimed at

deterrence and retribution." *Leatherman*, 532 U.S. at 432. They have been described as "quasi-criminal," *Haslip*, 499 U.S. at 19, and could be described as "private fines" intended to punish the defendant and to deter future wrongdoing. *Leatherman*, 532 U.S. at 432. "A jury's assessment of the extent of a plaintiff's injury is essentially a factual determination, whereas its imposition of punitive damages is an expression of its moral condemnation." *Id.*; *see also Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974) ("[Punitive damages] are not compensation for injury. Instead, they are private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence."); *Haslip*, 499 U.S. at 54 (O'Connor, J., dissenting) ("[P]unitive damages are specifically designed to exact punishment in excess of actual harm to make clear that the defendant's misconduct was especially reprehensible.").[24] According to the traditional common-law approach,[25] "the amount of the punitive award is initially determined by a jury instructed to consider

---

[24] According to the United States Supreme Court, one should presume "a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." *State Farm*, 538 U.S. at 419 (citing *Gore*, 517 U.S. at 576–77).

[25] At the time of this writing, twenty-three states have modified the common law approach by enacting statutes that limit the permissible size of punitive damages awards: Arizona, Alaska, Colorado, Idaho, Indiana, Louisiana, Kansas, Maine, Massachusetts, Mississippi, Montana, Nevada, New Jersey, North Carolina, North Dakota, Oklahoma, Ohio, South Carolina, Tennessee, Texas, Virginia, West Virginia, and Wisconsin. *See, e.g.*, Oh. Rev. Code § 2315.1(D)(1)(a) ("In a tort action…[t]he court shall not enter judgment for punitive or exemplary damages in excess of two times the amount of compensatory damages awarded to the plaintiff from that defendant[.]"); W. Va. Code §55-7-29(c) ("The amount of punitive damages that may be awarded in a civil action may not exceed the greater of four times the amount of compensatory damages or $500,000, whichever is greater."). *See also Gore*, 517 U.S. at 1618–20 (Ginsburg, J., dissenting) (surveying state legislative activity regarding punitive damages); *Leatherman*, 532 U.S. at 433 n.6 (identifying four additional states that had added punitive damages caps since *Gore* decision).

the gravity of the wrong and the need to deter similar wrongful conduct. The jury's determination is then reviewed by trial and appellate courts to ensure that it is reasonable." *Id.* at 14.

The common law approach to punitive damages, including its unpredictability and appellate review based on an undefined concept of excessiveness, was the subject of constitutional challenge in the High Court on numerous occasions beginning in, at least, the 1970s.[26] As stated in *Haslip*:

> [T]he constitutional status of punitive damages, therefore, is not an issue new to this Court or unanticipated by it. Challenges have been raised before; for stated reasons, they have been rejected or deferred. … But the Fourteenth Amendment due process challenge is here once again.

*Haslip*, 499 U.S. at 12.

Given the embedded root in state tort law of the common-law approach, the High Court declined to say that the method "is so inherently unfair as to deny due process and be *per se* unconstitutional." *Haslip*, 499 U.S. at 17. The High Court went on to note, however, that "[i]t would be just as inappropriate to say that, because punitive damages have been recognized for so long, their imposition is never unconstitutional." *Id.* at 18. In *Haslip*, the High Court determined that substantive due process principles serve as protections in punitive damages awards, invoking the "fair notice" principle embedded in

---

[26] *See, e.g.*, *Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 270–271 (1981) ("The impact of such a windfall recovery is likely to be both unpredictable and, at times, substantial..."); *Electrical Workers v. Foust*, 442 U.S. 42, 50–51 (1979); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350 (1974) ("In most jurisdictions jury discretion over the amounts awarded is limited only by the gentle rule that they not be excessive. Consequently, juries assess punitive damages in wholly unpredictable amounts bearing no necessary relation to the actual harm caused"); *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 82–84 (1971) (Marshall, J., joined by Stewart, J., dissenting).

the Due Process Clause and proffering concepts of "reasonableness" and "adequate guidance from the [trial] court." *Id.* at 18. Although noting that in some circumstances a punitive damages award of more than four times the amount of compensatory damages might be near the limit of constitutional impropriety, the High Court refused to draw a "mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case." *Id.*

Consistent with the Supreme Court's unwillingness in *Haslip* to impose a bright line or concrete limit on how to determine if an award of punitive damages meets constitutional muster, federal constitutional law in this area remained elastic. In *TXO Production Corp.*, 509 U.S. at 460, the High Court held that punitive damages must have a "reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that actually occurred." In *Gore*, 517 U.S. at 560, the Court invoked statutory multiples of compensatory damages as instructive, and again declined to impose a bright-line rule. It also articulated three "guideposts" for determining if an award of punitive damages is grossly excessive: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. *Id.* at 575.

More recently, in *State Farm* the Supreme Court further developed *Gore*'s second guidepost by adding more structure. In discussing the relationship between a punitive damages award and the harm or potential harm suffered by the victim, the Supreme Court articulated a non-binding single-digit ratio test.

> We decline again to impose a bright-line ratio which a punitive damage award cannot exceed. Our jurisprudence and the principles it has now established demonstrate, however, that in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process. In *Haslip*, in upholding a punitive damages award, we concluded that an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety. We cited that 4–to–1 ratio again in *Gore*. The [*Gore*] Court further referenced a long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish. While these ratios are not binding, they are instructive. They demonstrate what should be obvious: Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution.

*State Farm*, 538 U.S. at 425 (citing *Haslip*, 499 U.S. at 23–24, and *Gore*, 517 U.S. at 581 & n.33). The *State Farm* Court identified two exceptions to its suggested preference for a single-digit ratio: cases in which "a particularly egregious act has resulted in only a small amount of economic damages," and cases in which "the injury is hard to detect or the monetary value of non-economic harm might have been difficult to determine." *State Farm*, 538 U.S. at 425.

In Pennsylvania, the purpose of compensatory damages is also "to make the plaintiff whole." *Feingold v. Se. Pa. Transp. Auth.*, 517 A.2d 1270, 1276 (Pa. 1989). For decades, the alleged excessiveness of a compensatory verdict was measured by a "criterion of shockability." *Howarth v. Segal*, 232 F.Supp. 617, 620 (E.D. Pa. 1964) (citing *Flank v. Walker*, 157 A.2d 163, 165 (Pa. 1960)). As for punitive damages, their purpose in Pennsylvania, consistent with the norm, is "to punish the wrongdoers and to deter future conduct." *Feingold*, 517 A.2d at 1276. Pennsylvania continues to follow the common law approach except in the medical malpractice arena. *See* 40 P.S. § 1303.505 ("Except in

cases alleging intentional misconduct, punitive damages against an individual physician shall not exceed 200% of the compensatory damages awarded."). Thus, in this Commonwealth, a factfinder in a civil action for damages arising out of a non-medical tort claim enjoys discretion in the fixing of punitive damages. The factfinder may impose punitive damages for "torts that are committed willfully, maliciously, or so carelessly as to indicate wanton disregard of the rights of the party injured." *Thompson v. Swank*, 176 A. 211, 211 (Pa. 1934). "Punitive damages are not awarded as additional compensation but are purely penal in nature." *G.J.D. by G.J.D. v. Johnson*, 713 A.2d 1127, 1129 (Pa. 1998).

In the era predating the United States Supreme Court's fashioning of measurement tools for punitive damages, like the use of "guideposts" and ratios, the law in Pennsylvania was well settled that a jury verdict would be interfered with on the grounds of excessiveness only in cases where an award shocked the conscience of the court,[27] in which case the reviewing court could grant a remittitur or remand for a new trial. *See, e.g., Kirkbride v. Lisbon Contractors, Inc.*, 555 A.2d 800 (Pa. 1989) ("[A]t some point the amount of punitive damages may be so disproportionate when compared to the character of the act, the nature and extent of the harm and the wealth of the defendant, that it will shock the court's sense of justice. In those rare instances, the court is given discretion to remit the damages to a more reasonable amount."); *DiSalle v. P.G. Pub. Co.*, 544 A.2d 1345 (Pa. Super. 1988) (addressing request for new trial based on excessiveness of

---

[27] This concept of a punitive damages award's ability to shock has not been entirely eschewed by the High Court. *See TXO*, 509 U.S. at 481 (O'Connor, J., dissenting) (describing the punitive award as "a dramatically irregular, if not shocking, verdict by any measure"). Following the federalization of the standards for reviewing for excessiveness, the High Court has referred to shocking "constitutional sensibilities." *Haslip*, 499 U.S. at 18; *TXO*, 509 U.S. at 462; *Gore*, 517 U.S. at 581 n.34.

punitive damages), *abrogated on other grounds*, *Bd. of Supervisors of Willistown Twp. v. Main Line Gardens, Inc.*, 155 A.3d 39 (Pa. 2017)); *see also* 1 Summ. Pa. Jur. 2d Torts § 9:103 (2d ed.) (discussing excessiveness of punitive damages). Additionally, Pennsylvania embraced the guidance of Section 908 of the Restatement (Second) of Torts. *Chambers v. Montgomery*, 192 A.2d 355 (Pa. 1963); *Feld v. Merriam*, 485 A.2d 742 (Pa. 1984). That section provides:

> Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others. In assessing punitive damages, the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause and the wealth of the defendant.

Restatement (Second) of Torts § 908(2).[28]

Pennsylvania continues to follow the common law in the punitive damages arena. The United States Supreme Court's jurisprudence overlays its operation to prevent constitutionally excessive awards. While the High Court has developed various

---

[28] Observing that Section 908(2) did not include a requirement that "an award of punitive damages be proportional to compensatory damages," this Court maintained that it was the jury's function to determine whether and in what amount punitive damages should be awarded without a proportionality restriction. *Kirkbride*, 555 A.2d at 803. Consistent with this, the Suggested Standard Civil Jury Instructions informed juries that the "amount you assess as punitive damages need not bear any relationship to the amount you choose to award as compensatory damages." Former Pa.S.S.Civ.J.I. § 14.02 (Punitive Damages-Amount of Award). After *Haslip* and its progeny, this was a misstatement of the law.

Former S.S.Civ.J.I. § 14.02 was renumbered in 2005 to § 8.2 and edited to exclude the provision that an award of punitive damages "need not bear any relationship to the amount" awarded as compensatory damages. Inexplicably—in that the Defendants requested the current version of the instruction in their proposed jury instruction number 52—the trial court used the former version, to which the Defendants objected. N.T., 12/19/2018, at 277; N.T., 12/20/2018, at 198. On appeal, the Defendants challenged the ratio of compensatory to punitive damages but did not otherwise challenge the jury instruction.

guideposts and factors to consider in challenges to punitive verdicts based on excessiveness, its instructions are clear on two points: there is no bright line ratio that a punitive damages award cannot exceed; and the guideposts and factors do no operate mechanically because the facts and circumstances of each case are determinative in assessing the constitutionality of a punitive damages award.

**III. Whether the ratio for punitive to compensatory damages awarded in a multi-defendant case should be calculated on a per-judgment or per-defendant basis**

The ratio calculation in this case involves two factors: a single compensatory damages award entered against multiple defendants who are jointly and severally liable for the award[29] and distinct punitive damages awards against each of the Defendants. In multiple defendant cases, the ratio of punitive to compensatory damages has been calculated by other courts in one of two ways, i.e., on a per-defendant or a per-judgment basis. The per-defendant approach divides the punitive damages assessed against a defendant by the compensatory damages assessed against that defendant, and the per-judgment approach divides the total of punitive damages assessed against the defendants by the total of compensatory damages assessed against the defendants. *Compare Planned Parenthood*, 422 F.3d 949 (applying per-defendant ratio calculation), *Horizon Health*, 520 S.W.3d 848 (same), and *Chicago Title Ins. Corp. v. Magnuson*, 487 F.3d 985 (6th Cir. 2007) (same) *with Advocat, Inc. v. Sauer*, 111 S.W.3d 346, 363 (Ark.

---

[29] Joint and several liability is premised upon causation and the indivisibility of the harm caused. *Carrozza v. Greenbaum*, 916 A.2d 553, 556 & n.21 (Pa. 2007). A joint or concurrent tortfeasor whose tortious conduct was the legal cause of a plaintiff's injury bears liability for the full amount of damages (without any apportionment or diminution for the other cause or causes that cannot be apportioned) if his tortious conduct, along with the tortious conduct of other tortfeasors, caused an indivisible harm. *Harsh v. Petroll*, 887 A.2d 209, 211 & nn. 4, 5, 6 (Pa. 2005).

2003) (dividing total of punitive awards against all companies by full amount of compensatory damages award), *Bardis v. Oates*, 119 Cal. App.4th 1, 21 n.8 (2004) (same), and *Cooley v. Lincoln Elec. Co.*, 776 F.Supp.2d 511, 551–53 (N.D. Ohio 2011) (same). The Defendants argue for application of the per-judgment approach;[30] Northwest argues for the per-defendant approach[31] as applied by the trial court and the Superior Court in this case.

---

[30] The following entities filed amicus briefs in support of the Defendants ("Defense Amici"): Product Liability Advisory Council, Washington Legal Foundation, The Chamber of Commerce of the USA, and Philadelphia Association of Defense Counsel. In addition, the following parties jointly filed an amicus brief in support of the Defendants: Coalition for Civil Justice Reform, American Property Casualty Insurance Association, Pennsylvania Chamber of Business and Industry, Pennsylvania Manufacturers Association, Insurance Federation of Pennsylvania, LeadingAge PA. Defense Amici's arguments substantially overlap with each other and the Defendants' arguments.

[31] The American Association for Justice and The Pennsylvania Association for Justice jointly filed an amicus brief in support of Northwest ("Justice Amici"). They argue that the Defendants are placing entirely too much emphasis on a ratio to determine the constitutional question of whether an award of punitive damages is grossly excessive. In support, Justice Amici contend, among other reasons, that: (1) ratios provide limited information that cannot establish a valid presumption that a punitive damages award is unconstitutional; (2) such a presumption would elevate a mathematical formula to a degree that the United States Supreme Court has repeatedly rejected—marking a constitutional line by a simple mathematical equation; and (3) a bright-line rule regarding a ratio that creates a presumption of unconstitutionality fails to take into account the egregiousness of a defendant's misconduct, which clearly is the primary factor that drives a consideration of whether a punitive damages award is reasonable.

Justice Amici also argue that this case in a poor vehicle to decide whether a constitutional ratio in multi-defendant cases should be on a per-defendant or per-judgment basis. They suggest that, because only significantly disproportionate punitive-to-compensatory awards should be considered unconstitutional and because the ratio in this case is not significantly disproportionate even under the Defendants' theory, this Court should not reach that issue.

A.      Arguments of the Parties

According to the Defendants, the Superior Court erroneously held that the ratio calculation in multi-defendant cases is computed on a per-defendant basis, rather than by aggregating all of the punitive damages as the numerator in one ratio calculation, i.e., computed on a per-judgment basis. In support of that position, the Defendants first assert that courts and commentators have expressed the need to calculate punitive damages on a per-judgment basis when joint tortfeasors are in the same corporate family. The Defendants' Brief at 37, 38 (citing *Advocat,* 111 S.W.3d at 363, and *The ratio guidepost in the lower courts*, 5 Bus. & Com. Litig. Fed. Cts. § 48:54 ("[W]hen multiple defendants are members of the same corporate family and the compensatory award is joint and several, it is more appropriate to calculate a single ratio using the full compensatory award as the denominator and the total punitive awards as the numerator, as opposed to comparing each separate punitive award to the total awards of compensatory damages.")).[32] Here, the Defendants contend, the Superior Court erred in rejecting the per-judgment calculation approach, even though, "according to the majority, the jury viewed [First National] as one singular entity, thus eliminating any factual predicate for an

---

[32] We note that the Defendants' argument is based on the premise that Turk is part of the corporate family otherwise populated by First National. This treatment of Turk by First National highlights the mechanical nature of their position on this issue and also increases the per-judgment ratio. It is not possible to view Turk as part of a theoretical First National corporate family under the facts of this case because all the conduct attributable to Turk took place while he was an employee of Northwest.

The Defendants' computation of the ratio combines the punitive damages awards of all four Defendants ($2.8 million), divides it by $250,000, resulting in a single ratio of 11.2 to 1. Applying the Defendants' methodology requires the computation of two ratios: one for First National, i.e., the three corporate defendants, as a single entity, and one for Turk. Applying this formula results in a 10 to 1 ratio for First National and a 1.8 to 1 ratio for Turk.

assessment of compensatory damages on a per-defendant basis." The Defendants' Brief at 37 (citing *The Bert Co.*, 257 A.3d at 102-33 (collectively referring to FNIA, First National Bank, FNB Corporation, and/or Turk as the "First National Family" or "Family" more than sixty-five times)).

The Defendants further assert that the Superior Court's approach to calculating punitive damages fails to account for how compensatory damages are awarded in multi-defendant cases. They argue that punitive damages, like compensatory damages, should be awarded depending upon the type of tortfeasor at issue: "In cases involving consecutive or successive tortfeasors, the jury assesses compensatory damages on a per-defendant basis. In contrast, in cases involving joint or concurrent tortfeasors, the jury assesses compensatory damages, cumulatively, against all defendants, because joint and several liability applies." The Defendants' Brief at 39. Based upon this premise, the Defendants submit that calculating the punitive to compensatory damages ratio on a per-defendant basis in a case involving joint or concurrent tortfeasors is "to perpetuate a fiction," i.e., "to count the same compensatory damages award multiple times…despite the fact that it is logically impossible that each defendant will pay the full amount of a compensatory damages award in a joint and several liability scenario." *Id.* (citation omitted).

The Defendants reason that the per-defendant calculation of punitive damages approach is not appropriate among joint tortfeasors for several additional reasons. First, because the jury assesses compensatory damages as a whole and punitive damages individually, the punitive to compensatory damages comparison is not an apples-to-

apples comparison.[33]  Second, "because compensatory damages often contain a punitive element," calculating the constitutionally permissible damages ratio in joint tortfeasor cases requires a rule that protects tortfeasors from being deprived of their constitutional right to be free from the arbitrary deprivation of property.  The Defendants' Brief at 41. Third, because "the per-defendant approach inevitably leads to a smaller ratio of punitives-to-compensatories and, in turn, decreases the probability that the ratio for a single tortfeasor will ever exceed 9:1," it becomes almost impossible for tortfeasors to challenge a punitive damages award based on excessiveness.  *Id.* at 42.  Fourth, the Superior Court's reliance on *Planned Parenthood*[34] and *Horizon Health* in support of the per-defendant approach is "misplaced," because both of those cases failed to account for the problem of counting the total amount of compensatory damages multiple times, i.e., per each defendant. The Defendants' Brief at 43.

---

[33]  In support, the Defendants cite to *Bardis v. Oates*, 119 Cal. App.4th 1 (2004).  The Defendants' Brief at 40.  However, their analysis of that case is incomplete and, therefore, unpersuasive.  In *Bardis*, the jury found the multiple defendants jointly and severally liable for a single compensatory damages award and liable for individual punitive awards.  The Defendants fail to explain that the court combined the individual punitive awards because there was no reason on the record to maintain strict culpability lines between the individual defendant and the corporate defendant where the individual was the manager and principal owner of the company.  *Bardis*, 119 Cal. App.4th at 22 n.8.  *Bardis* is not instructive because that is not the type of relationship that exists between the Defendants, as found by the jury and confirmed by the Superior Court's review of the record.  *The Bert Co.*, 257 A.3d at 102–08.

[34]  The Defendants suggest that the Ninth Circuit merely assumed that the compensatory damages awarded in *Planned Parenthood* were joint and several.  The Defendants' Brief at 43.  On the contrary, the Ninth Circuit accepted that characterization, observing that "the district court held (and the parties do not dispute) that the [compensatory damages] awards are joint and several" and expressing that it had "no quarrel with the district court's interpretation of the import of the verdicts[.]" *Planned Parenthood*, 422 F.3d at 960, n.5.

In their final challenge to the Superior Court's per-defendant approach (which presumes a remitter), the Defendants submit that a per-judgment approach allows for an award that differentiates among defendants based on their varying degrees of reprehensibility. To this point, the Defendants explain, "Once the total punitive damages award is remitted to a constitutionally acceptable figure, that sum can be allocated to each defendant *pro rata*, based on the relative size of the punitive awards made by the jury—which is what the intermediate appellate court did in *Horizon Health*[,] 520 S.W.3d at 859, 872." *Id.* at 44; Reply Brief at 14. The Defendants argue that a remittitur is required as a result of the 11.2 to 1 ratio and then conclude that "[t]he logical approach here is to use a balanced equation, in which the **total** punitive damages are the numerator and the **total** compensatory damages are the denominator, i.e., total punitive/joint-and-several compensatory." *Id.* at 45 (emphasis in original).

Northwest challenges the Defendants' position that a due process analysis of a punitive damages award mandates a ratio that compares Northwest's actual harm on a per-judgment basis, i.e., a ratio that compares the compensatory damages award to the aggregate of the individual amounts the jury assessed against each of the Defendants in punitive damages (here, $2.8 million). Northwest asserts that the Defendants fail to offer any principles of law to support their contention. More specifically, Northwest asserts that the Superior Court's individualized, per-defendant ratio calculation "is beyond reproach" because a punitive damages award implicates personal rights, specifically, a person's right to fair notice of the potential penalties for tortious conduct. Northwest's Brief at 30. Northwest explains that many courts have employed this method, including the *Planned*

*Parenthood* Court. *See id.* at 31–33 (discussing cases that utilized the per-defendant basis for the compensatory-to-punitive ratio).

According to Northwest, calculating the ratios individually by using the punitive award assessed against each defendant as the numerator and the total compensatory award for each jointly and severally defendant as the denominator is the correct formulation for multiple reasons: (1) the per-defendant "approach serves to best assess 'the reasonable relationship' between punitive damages and harm"; (2) it "advances the task of determining whether due process rights have been upheld"; and (3) it respects the jury's verdict because "the jury found differing degrees of egregious behavior for punitive damages, while finding joint and several liability for compensatory harm." Northwest's Brief at 31 (citing *Planned Parenthood*, 422 F.3d at 960–62, and *Ingham v. Johnson & Johnson*, 608 S.W.3d 663 (Mo. Ct. App. 2020)). Thus, Northwest continues, "a plaintiff's actual harm is represented by the amount a plaintiff is awarded in compensatory damages for the injury the defendant caused[.]" *Id.* at 34 (citing *State Farm*, 538 U.S. at 424–25). So, in calculating a ratio for each of the Defendants, it was proper to include the individual punitive damages awards as the numerator and the joint and several $250,000 compensatory damages award as the denominator for each First National entity and, as to Turk, it was proper to include the individual $300,000 punitive damages award as the numerator and the compensatory damages award of $164,943 as the denominator.

Next, Northwest points to the uncontroverted fact that it sustained "a single, indivisible injury" as a result of the Defendants' misconduct; that is, the actual economic harm to Northwest could not be divided into separate, distinct parts. Northwest's Brief at 36. Northwest asserts that the per-defendant approach adheres to that principle. In short,

each tortfeasor bears liability for the full amount of damages where his conduct, and that of other tortfeasors, caused an indivisible harm, and he is not relieved of his responsibility for the entire indivisible harm that he proximately caused, even if other tortfeasors also caused the same harm.[35]  Northwest explains that there is only one amount that represents the actual harm that each of the Defendants caused Northwest.  *Id.* at 40.  By using the amount of compensatory damages awarded by the jury as the denominator in the ratio calculation for each of the Defendants, the trial court did not "double-count" the amount of actual harm.  Rather, the court compared "the amount awarded in punitive damages against each [of the Defendants] to the actual damages that each [of the Defendants] caused" Northwest, which "was proper and constitutional."  *Id.* at 36.

Northwest also finds unavailing the Defendants' single-corporate-entity argument, echoing the trial court's observations that First National "insisted on their separate corporate existence and repeatedly made every effort to separate themselves, one from the other," and that the jury was instructed to "decide whether punitive damages are to be assessed against each Defendant by that Defendant's conduct alone[,]" which the jury did.  Northwest's Brief at 38 (citing Trial Court Opinion, 4/29/2019, at 3; N.T., 12/20/2018, at 172); Special Verdict Sheet, 12/21/2018, at 10.  Finally, Northwest contests the Defendants' reliance on the observation in *State Farm* that, in many cases, compensatory damages include a component that is duplicated in a punitive damages award.

---

[35]  In response to the Defendants' argument that none of them will actually pay the total amount of compensatory damages, Northwest is correct in asserting that the amount a plaintiff "is awarded in compensatory damages for its actual harm" is separate and distinct from "the amount [a tortfeasor] may collect from another joint tortfeasor in contribution[.]" Northwest Brief at 37.  *Accord Puller v. Puller*, 110 A.2d 175, 177 (Pa. 1955) ("Contribution is not a recovery for the tort [committed against the plaintiff] but the enforcement of an equitable duty [among joint tortfeasors] to share liability for the wrong done.").

Specifically, Northwest asserts that United States Supreme Court "made no such statement. Rather, the Court observed that in the case before it, there was likely a duplicative component in the punitive damages award because plaintiffs were awarded $1 million dollars [sic] in compensatory damages for emotional distress." *Id.* at 40 (citing *State Farm*, 538 U.S. at 426). In contrast, Northwest contends, this case does not include an award of compensatory damages with a potentially punitive component.[36]

B.      Analysis

The Superior Court found the reasoning expressed in *Planned Parenthood*, 422 F.3d 949, and *Horizon Health*, 520 S.W.2d 848, persuasive: "computation of damages ratios in multi-defendant cases are on a per-defendant basis, rather than by aggregating all of the compensatory and punitive damages on a per-judgment basis." *The Bert Co.*, 257 A.3d at 128. In *Planned Parenthood*, the jury awarded individualized compensatory damages to six plaintiffs that were identical as to each of fourteen defendants, for a total, **joint and several** compensatory award of $526,336.14.[37] *Planned Parenthood*, 422 F.3d at 952, 960. After grouping the defendants into different tiers for purposes of exemplary damages, "the jury awarded each plaintiff punitive damages in a discrete amount from each defendant," for a total punitive damages award of $108.5 million. *Id.* at 960. In assessing the ratio calculation, the Ninth Circuit Court of Appeals reminded that due process "prohibits the imposition of grossly excessive or arbitrary punishments on a

---

[36]   We agree. Neither the claims asserted in this case nor the record provide any indication that the award of compensatory damages included a punitive element.

[37]   According to the Ninth Circuit, the trial court deduced that the compensatory awards were joint and several from the jury's award of the amount of harm suffered by each plaintiff against each defendant and the lack of argument by the plaintiffs that they were each entitled to fourteen times this amount. *Planned Parenthood*, 442 F.3d at 960 n.5.

[particular] tortfeasor." *Id.* at 953 (quoting *State Farm*, 538 U.S. at 416). Therefore, it

concluded:

> it makes sense to compare each plaintiff's individual
> compensatory damages and punitive damages awards as to
> each defendant because this approach simplifies the task of
> assessing constitutional reasonableness. If it appears that
> the envelope is pushed too far, the reviewing court can figure
> out who is to receive what amount of money from whom, and
> remit on a per plaintiff, per defendant basis.

*Id.* at 962.[38]

In *Horizon Health*, the jury awarded $55,049.24 in actual damages to a single

plaintiff, Horizon Health, finding the five individual defendants[39] caused the loss in varying

degrees. *Horizon Health*, 520 S.W.3d at 871–72. The jury awarded a total of $1,750,000

in exemplary damages against the individual defendants, but the intermediate appellate

court suggested a remittitur to $220,196.96, using a per-defendant approach; the

suggested remittitur would result in a ratio of 4 to 1 as to each defendant. In reviewing

the intermediate court's ratio calculation, the Texas Supreme Court voiced the same

---

[38] Having applied a per-defendant calculation to the individual compensatory and punitive damages awards, the Ninth Circuit concluded that the resulting ratios did not pass constitutional muster. The court observed that, with few exceptions, the ratios "were well in excess of single digits," most of the compensatory awards were substantial, but not all of the plaintiffs' damages were quantifiable, and one defendant's conduct was "particularly reprehensible." *Planned Parenthood*, 422 F.3d at 963. Given these circumstances, the court concluded that a 9 to 1 ratio "would reasonably serve the interests of punishment and deterrence." *Id.* Accordingly, it remitted the punitive awards "to a sum for each plaintiff that is nine times that plaintiff's compensatory recovery," allocating "that amount of punitive damages among defendants in the same proportion as the jury did in its verdicts." *Id.* at 963–64.

[39] The Texas Supreme Court reversed the trial court's joint-and-several exemplary damages award against the two corporate defendants. It directed entry of a take-nothing judgment as to these corporate defendants' liability for exemplary damages. *Horizon Health*, 520 S.W.3d at 883.

relationship principle: the constitutional concern at issue—the arbitrary deprivation of property through excessive punitive damages without due process—is assessed on an individual basis. *Horizon Health*, 520 S.W.3d at 877.

*Planned Parenthood* and *Horizon Health* involve joint and several compensatory damages awards that are distinguishable from the compensatory damages award in this case. In those sister court cases, the juries entered individual amounts of compensatory damages against each defendant. While the defendants were jointly and severally liable to the plaintiffs for the cumulative compensatory damages award, the ratios were calculated using the individual compensatory damages awards as the denominator, not the cumulative joint and several amount of compensatory damages. Those cases represent straightforward per-defendant ratio calculations. In contrast, pursuant to the agreement of the parties in this case, the jury entered a joint and several compensatory damages award without allocating responsibility for that amount among the Defendants or assigning a specific amount of compensatory damages against each of the Defendants (which would later be cumulated for entering judgment against each of the jointly and severally liable Defendants).

A more analogous situation is reported in the Missouri intermediate appellate court's decision in *Ingham*, 608 S.W.3d 663. There, twenty-two consumers filed an action against a cosmetics manufacturer and its parent company, asserting claims for strict liability and negligence based on evidence that the consumers developed ovarian cancer due to their use of talcum powder. The jury awarded $550 million in actual damages ($25 million multiplied by twenty-two Plaintiffs) jointly and severally against the defendants. "The jury recommended, and the trial court awarded, $990 million in punitive damages

against JJCI [the manufacturer] and $3.15 billion against J&J [the parent company],

yielding ratios of 1.8:1 for JJCI and 5.72:1 for J&J." *Id.* at 721–22. The ratios were

calculated by dividing "each individual punitive damages award by the entire actual

damages award where defendants were jointly and severally liable for all actual

damages." *Id.* at 722 n.27. After reducing the total amount of actual damages because

the trial court lacked personal jurisdiction over certain consumers, the appeals court

reduced the punitive damages awards against the two defendants proportionally to

"reflect the ratio of punitive to actual damages assessed originally by the trial court." *Id.*

at 722 (citation omitted). According to the appeals court, this method gave effect to the

original judgment of the jury and avoided excessive damage awards. *Id.* The *Ingham*

Court did not express its rationale for using the per-defendant approach in the context of

a single compensatory damages award, apparently relying on the joint and several liability

of the defendants for its choice.[40]

---

[40] In *Lewellen v. Franklin*, 441 S.W.3d 136 (Mo. 2014), the Missouri Supreme Court used the per-defendant approach under the same circumstances presented in *Ingham*. *Id.* at 147. The Missouri Supreme Court likewise did not express its rationale for using this calculation. The per-defendant approach has also been applied in two other jurisdictions where a single compensatory damages award was entered against jointly and severally liable defendants. *Merrick v. Paul Revere Life Ins. Co.*, 594 F.Supp.2d 1168, 1190–91 (D. Nev. 2008) (relying on Nevada law to calculate ratio separately for each defendant by dividing punitive damages award by total of trial judgment where defendants "were jointly and severally liable without apportionment for the underlying harm their conduct caused"), and *Atlantic Human Resource Advisors, LLC v. Espersen*, 76 V.I. 583, 636 (V.I. 2022) (holding that court should evaluate ratio by comparing punitive damages awarded against each of three jointly and severally defendants who did not act with same level of reprehensibility to total compensatory damages award; citing *Planned Parenthood* and *Horizon Health* for the proposition that the *Gore* "factors must be evaluated separately as to each punitive damage award against each separate defendant, rather than considering all damages awarded against all defendants collectively").

In contrast, based on a jury verdict analogous to the one in this case, the federal District Court for the Northern District of Ohio utilized a per-judgment approach. *Cooley v. Lincoln Electric Co.*, 776 F.Supp.2d 511 (N.D. Ohio 2011). The jury returned a verdict finding four defendants liable to the plaintiff and awarded $1.25 million in compensatory damages. The jury allocated 37% of the fault to the plaintiff and, as a result, the total compensatory damages award was reduced to $787,500. The jury awarded punitive damages against each of the defendants in separate amounts. The total amount of the punitive damages awards was $5 million. Relevant to our discussion, the defendants challenged the punitive damages award as excessive, and the parties disputed the method of calculating the *Gore* ratio.

As to the appropriate calculation, the defendants argued that the ratio for each defendant should be calculated for each defendant individually and the denominator in the individual calculations should be the reduced compensatory damages award ($787,500) divided by four (to reflect an equal division among the four defendants) rendering a denominator of $196,875. Using this method resulted in ratios of 8.9 to 1, 8.9 to 1, 3.8 to 1, 3.8 to 1.

In contrast, the plaintiffs argued that the ratios should not be calculated individually and should be measured using the total compensatory damages unreduced by plaintiff's comparative fault ($5 million) as the denominator and the total punitive damages award as the numerator. This calculation, $5 million divided by $1.25 million, resulted in a ratio of 4 to 1.[41]

---

[41] As is apparent, in *Cooley* the plaintiff advocated for a per-judgment approach, and the defendants argued for a modified per-defendant approach for the calculation of the ratio. The parties in this appeal took the opposite positions.

The *Cooley* Court devised a third calculation, reflecting the per-judgment approach: total punitive damages divided by the total compensatory damages reduced by the percentage of the plaintiff's comparative fault ($5 million divided by $787,500), resulting in an "overall ratio" of 6.3 to 1. *Cooley*, 776 F.Supp.2d at 552. While it ultimately adopted this ratio as the "maximum *Gore* ratio" for its ensuing analysis,[42] the *Cooley* Court noted that "while the second guidepost requires more of an analysis than simply a mathematical calculation of the ratio, it is worth observing that all of the [ratios considered], using all of these different approaches, are single-digit." *Id.*

The *Cooley* Court rejected using the per-defendant approach advanced by the defendants (which resulted in the highest ratios) because dividing the compensatory damages award equally among the defendants for purposes of the calculation was "misleading." *Cooley*, 776 F.Supp.2d at 552. At trial, it was determined that, "due to the secret joint-defense agreement, the jury would not be instructed to allocate compensatory damages separately." *Id.* at 552 n.203. Consequently, it was not possible for the district court to accurately calculate the ratio for each defendant individually. *Id.* at 552.

For purposes of our consideration, it is important to emphasize that the *Cooley* Court did not chose the per-judgment approach to calculate the ratio because it best reflected the purpose of the second *Gore* factor. There was no consideration of whether the per-judgment approach under the circumstances reflected the impact on each defendant's due process rights. Nor were the defendants related in a "corporate family"

---

[42] In contrast to the appeal before us where we limited our review to determine the appropriate mathematical calculation of the ratio, the *Cooley* defendants presented a challenge on all four *Gore* factors and developed case specific arguments based on the evidence relative to the constitutional bounds of the ratio. The *Cooley* Court ultimately affirmed the punitive damages award. *Cooley*, 776 F.Supp.2d at 555.

sense. It appears that the *Cooley* Court believed it had no choice but to develop its own methodology to account for the joint-defense agreement.

As in the case before us, by agreement of the parties,[43] there was no allocation of compensatory damages as a result of the manner in which the jury was instructed. Thus, as in *Cooley*, we have no basis to determine what amount of the $250,000 compensatory damages award correlates with the conduct of any specific defendant.

Neither the plaintiff nor the defendants in *Cooley* advocated for the per-defendant approach invoked by Northwest, i.e., doing a ratio calculation for each of the Defendants using the total compensatory damages award as the denominator and the individual punitive damages award against each of the Defendants as the numerator. Based on our survey of other jurisdictions addressing this scenario, Missouri and the Virgin Islands have used this calculation to determine the *Gore* ratio.[44] It also appears that our Superior Court has used this approach. *See* supra note 23 (discussing *Reading Radio*, 833 A.2d 199). In addition, as seen in *Horizon Health* and *Planned Parenthood*, Texas and the Ninth Circuit have endorsed the per-defendant approach to calculating the ratio, albeit where

---

[43] There is nothing in the record before us to indicate that there was a joint-defense agreement. We only know that the Defendants agreed with Northwest that there would be a lump sum compensatory damages award based on the highest amount awarded on any one cause of action.

The *Cooley* Court seemed to be of the view that the joint-defense agreement on the allocation of payment of damages precluded an instruction to the jury to allocate the compensatory damages among the defendants. We are not clear why an agreement among defendants on how damages would be allocated for payment among them has any impact on a jury making an allocation of damages based on the evidence. Notwithstanding such a determination, the defendants are free to agree among themselves how the compensatory damages award will be paid.

[44] *See* supra note 40.

the jury allocated damages among the jointly and severally liable defendants, and the allocated amount of compensatory damages was used as the denominator. Moreover, as we view the decisions applying the per-judgment approach, it becomes apparent that the courts are in reality applying a per-defendant approach. This is because in these cases multiple corporate defendants are treated as one defendant because the defendants were, or acted as, a single entity, and the punitive damages awards are cumulated to determine the numerator.[45]

We emphasize, as evidenced by the High Court's rulings, an analysis of the constitutionality of a punitive damages award must account for its impact on a defendant's right to due process. *State Farm*, 538 U.S. at 416–17 ("Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receives fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose."). The per-defendant ratio assesses the individualized

---

[45] Courts using the per-judgment approach aggregated the individual punitive damages awards and compared them to the total compensatory awards because the separate defendants were or acted as a singular entity. Viewing the application from this perspective, the methodology is actually a measurement on a per-defendant basis because multiple defendants are collapsed into one in the ratio. *See, e.g.*, *Advocat, Inc. v. Sauer*, 111 S.W.3d 346, 363 (Ark. 2003) (dividing total remitted punitive damages of $21 million against three companies that operated nursing home as one business by full amount of remitted compensatory damages, $5 million); *Bardis v. Oates*, 119 Cal. App.4th 1, 21 n.8 (2004) (dividing total punitive damages of $7 million against individual and corporate defendants, where individual was manager and principle owner of corporation, by joint and several compensatory damages of $165,527.63). *Cf. Cooley*, 776 F.Supp.2d at 552, discussed supra at pp. 37–40.

Contrary to the Defendants' argument, this case was not tried as a single-corporate-entity case. Trial Court Opinion, 4/29/2019, at 3; N.T., 12/20/2018, at 172; Special Verdict Sheet, 12/21/2018, at 10. Northwest was required to prove wrongdoing by each defendant. The jury was charged in that manner and determined liability and punitive damages in that manner as instructed on the verdict sheet.

impact intended by the punitive damages awards, whereas the per-judgment approach distorts the analysis by obscuring the due process rights of the individual defendants. A composite analysis undoes the jury's determination of an individual's reprehensibility and need for deterrence as reflected in the punitive verdict. Indeed, given the purpose of punitive damages, the jury could not have been instructed to award a composite punitive verdict.

Punitive damages awards must be tailored to each defendant. Unlike responsibility for causing the harm, which as to jointly and severally liable defendants is indivisible for purposes of liability, reprehensibility is a determination that must be individualized as to each defendant. In this case, the jury deliberated and assessed the reprehensibility of the conduct of each of the Defendants and determined the punitive damages verdict necessary to punish and deter each of the Defendants. *See The Bert Co.*, 257 A.3d at 124 ("Here, the jury found each defendant's misconduct morally reprehensible but to varying degrees."). The per-defendant approach reflects this reality.

In the trial of this case, the principles of joint and several liability were recognized in the parties' agreement to instruct the jury to award a single compensatory damages award as to all the Defendants. Pursuant to Pennsylvania statute: "A defendant's liability in [an intentional tort action] shall be joint and several, and the court shall enter a joint and several judgment in favor of the plaintiff and against the defendant for the total dollar amount awarded as damages[.]" 42 Pa.C.S. § 7102(a.1)(3)(ii). Joint and several liability is premised upon causation and the indivisibility of harm caused to the plaintiff. *Carrozza v. Greenbaum*, 916 A.2d 553, 566 n.21 (Pa. 2007). A joint or concurrent tortfeasor is not relieved of responsibility for the entirety of indivisible harm even though some other

tortfeasor's misconduct also caused that same harm.  *Powell v. Drumheller*, 653 A.2d 619, 622 (Pa. 1995).

The purpose of joint and several liability is to enhance the collectability of the plaintiff's verdict.  The plaintiff can recover the full amount of an award against any jointly and severally liable defendant, avoiding the barrier to compensation created by defendants without the financial resources to satisfy the judgment.  *See AAA Mid-Atlantic Ins. Co. v. Ryan*, 84 A.3d 626, 631 (Pa. 2014) ("[Joint and several liability] allows an injured party to recover an entire judgment from any one responsible tortfeasor.").

The fact that defendants are jointly and severally liable as a matter of law does not mean that a jury cannot allocate responsibility for the harm among those defendants.  If separate compensatory damages awards had been entered against the Defendants in this case, the amounts would have been cumulated for purposes of Northwest entering judgment against each of them.  The fact that this did not occur here was because the parties chose not to have the jury allocate the responsibility for the harm to Northwest.[46]

As a result, utilizing the per-defendant approach to calculate the *Gore* ratio does not perfectly reflect a comparison of the Defendants' responsibility for the harm to the reprehensibility of the Defendants' conduct.  It is certainly possible that the jury believed that the takeover scheme could not have been accomplished without Turk working from the inside of Northwest and that he bore a greater responsibility for the compensatory

---

[46]  The Fair Share Act makes clear that a jointly and severally liable defendant can seek contribution from other jointly and severally liable defendants who caused the same harm. *See* 42 Pa.C.S. § 7102(a.1)(4) ("Where a defendant has been held jointly and severally liable under this subsection and discharges by payment more than that defendant's proportionate share of the total liability, that defendant is entitled to recover contribution from defendants who have paid less than their proportionate share.").  This same allocation of responsibility for the harm can be determined by the jury in the principal case.

loss; or, it could have concluded that FNIA, with its knowledge of the insurance industry and strategic planning capabilities, was responsible for an elevated amount of responsibility for the compensatory damages; or FNB, with its financial clout, was disproportionately responsible for Northwest's harm; or the Defendants were equally responsible for the loss. We will never know the jury's opinion as a result of the parties' agreement on the jury charge and verdict slip culminating in a single compensatory damages award. However, this information gap, inevitable because of this trial strategy, is not a basis to abandon the per-defendant approach to calculating the *Gore* ratio.

Cumulating the punitive verdicts as required under the per-judgment approach obliterates the jury's assessment of each defendant's reprehensibility, and we cannot conceive a reason for doing so where the Defendants are not a single corporate entity. Here, the single compensatory damages award reflects the parties' decision to have the jury consider the harm as indivisible. Consequently, under the circumstances, the per-defendant calculation of the *Gore* ratio—dividing the individualized punitive damages awards by the total compensatory damages award—is appropriate. This was the methodology used by the trial court and the Superior Court.

We reject the Defendants' contention that the utilization of this approach "perpetuates a fiction" by utilizing the compensatory damages award multiple times in a case involving jointly and severally liability defendants. Instead, this approach effectuates the parties' agreement to have the compensatory damages award reflect the General Assembly's directive that such tortfeasors are in fact individually liable to the victim of an intentional tort for the full amount of damages. As a result, the verdict returned by the jury reflected an indivisible harm. Tampering with this determination is not within our

purview. Similarly, the individualized punitive damages awards reflect the jury's verdict on the degree of reprehensibility of each of the Defendants. This is the correct foundation for the due process analysis. We will not override these determinations. Under these circumstances, it is the per-judgment approach advanced by the Defendants that would create a fiction.

Utilizing the per-defendant approach, the trial court correctly calculated the ratio of punitive damages to compensatory damages contemplated under the second *Gore* factor as follows:

| | |
|---|---|
| Turk | 1.8 to 1 |
| First National Bank | 2 to 1 |
| FNB Corp. | 2 to 1 |
| FNIA | 6 to 1 |

Trial Court Opinion, 8/6/2019, at 4. The trial court concluded that, while the individual calculations fall within the single-digit ratio explained in *State Farm*, the "global ratio" (per-judgment ratio of 11.2 to 1) only slightly exceeds it. *Id.* Recognizing that there is no explicit ratio that a punitive damages award may not surpass, and that the award must be based on the facts and circumstances of the Defendants' conduct and harm to Northwest, the trial court validated the jury award, finding that it did not shock the court's conscience. *Id.* While the trial court's ultimate conclusion is expressed in pre-*Haslip* terminology, its opinion as a whole reflects a thorough consideration of the evidence of record, the requisite reprehensibility, and a recognition of the due process implications of the relationship between the compensatory and punitive damages awards. Although the trial court did not decide that the per-defendant ratio calculation was preferable to the per-

judgment calculation, the Superior Court expressly so decided and approved the trial court's methodology. *The Bert Co.*, 257 A.3d at 128. We affirm the decision of the Superior Court to the extent that it affirmed the trial court's methodology.

Determination of the ratio of punitive to compensatory damages is not the end of the examination of the relationship between the plaintiff's harm as reflected in the compensatory damages award and the reprehensibility of the defendant's conduct. "[C]ourts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and the general damages recovered." *State Farm*, 538 U.S. at 426. We emphasize that the second *Gore* factor does not operate mechanically. Without regard to the totality of the circumstances, the Defendants view the calculation of the ratio as the endgame. Either it is too high or too low, and the constitutional question is answered. This is wrong.[47]

---

[47] While the adequacy of the evidentiary support for any of the punitive damages awards is not before us, we note that the ratio for FNIA at 6 to 1 is three times higher than the ratios associated with the other defendants. The jury was correctly instructed that in making an award of punitive damages it should take into account not only punishment but deterrence. N.T., 12/20/2018, at 170. Given that FNIA President Martin Munchok testified that, if he had it to do all over, he would engage in the same conduct detailed by the evidence, N.T., 12/14/2018, at 229, a punitive award containing a large deterrence factor is not surprising. In addition, it is clear from the record as a whole that FNIA gave birth to the scheme that was subsequently embraced and advanced by the other Defendants.

As to the remaining ratios of 2 to 1 or less, we note that Defendants posit that such ratios are acceptable because they are consistent with prior punitive damages awards in Pennsylvania. The Defendants' Brief at 58 (citing *Reading Radio* and *B.G. Balmer*).

## IV.    Whether a court may consider the harm that the plaintiff could have suffered and use it as a post hoc justification for an award of punitive damages

The Defendants contend that the Superior Court erroneously injected potential harm into the case sua sponte as a post hoc justification for the jury's punitive damages awards.  Northwest considers the court's discussion to be relevant and supported by the record.

### A.    Arguments of the Parties

According to the Defendants, at trial Northwest made only passing reference to the concept of potential harm to Northwest if the lift out and ultimate hostile takeover were successful.  Furthermore, it never offered a developed argument to the Superior Court that the court should consider such harm in evaluating the constitutionality of the $2.8 million punitive damages award.  Thus, the Defendants reason, whatever role potential harm has under the *Gore* guideposts, it cannot be used as an after-the-fact justification to save an otherwise unconstitutional punitive damages award.  Yet, the Defendants assert, the Superior Court utilized the potential harm to Northwest for this exact purpose.  The Defendants support this argument by selectively referring to the record, which, they claim, demonstrates that a Northwest executive wrote to Northwest's remaining customers that the company had the resources to service and retain them all.

The Defendants also believe that Northwest offers this Court a flawed argument on potential harm, insisting that Northwest fails to point to anything in the record that would suggest either party introduced the issue of potential harm in the lower courts, let alone that the jury considered potential harm in crafting its punitive damages award.  In addition, the Defendants challenge Northwest's suggestion that "potential harm" encompasses everything that could have happened in a case.  On this point, the

Defendants highlight the United States Supreme Court's explanation that "the proper inquiry is whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred." The Defendants' Brief at 16-17 (quoting *Gore*, 517 U.S. at 581).

The Defendants further submit that the Superior Court's potential harm analysis conflicts with Supreme Court precedent. Specifically, the Defendants argue that the *Gore* Court did not hold that potential harm is a valid consideration when reviewing the constitutionality of a punitive damages award in all cases. Rather, the Defendants assert, the Supreme Court merely stated that "there is no suggestion that Dr. Gore or any other BMW purchaser was threatened with any additional potential harm by BMW's nondisclosure policy." The Defendants' Brief at 47 (quoting *Gore*, 517 U.S. at 582). Assuming arguendo that potential harm is a valid consideration under the circumstances of this case, the Defendants maintain that the Superior Court ignored the fact that Northwest eliminated any hypothetical "potential harm" by obtaining a preliminary injunction in the early stages of litigation, thereby rendering potential harm an inapplicable consideration.

Contrary to the Defendants' argument that potential harm should not be considered in these circumstances, Northwest highlights cases, such as *Gore* and *State Farm*, wherein the Supreme Court clearly spelled out that courts can assess the potential harm from tortious conduct when contemplating the constitutionality of punitive damages awards. According to Northwest, because no defendant "has to pay" compensatory damages for potential harm, the amount of harm that a defendant could have caused "only has a relationship to the degree of wrong," i.e., to the assessment of punitive

damages for purposes of punishment and deterrence. Northwest's Brief at 37. Thus, Northwest opines, the Superior Court properly considered the potential harm that Northwest could have suffered in this case. Moreover, Northwest asserts, the potential harm it could have suffered makes the ratio of damages awarded especially reasonable.

Concerning the Defendants' contention that the Superior Court improperly injected potential harm into this case sua sponte, Northwest posits that the court merely applied the law that Northwest presented to the court, i.e., *Gore* and *State Farm*. Northwest's Brief at 46–47 (citing the Defendants' First Superior Court Brief at 49–50). In fact, Northwest maintains, in relying on *Gore* and *State Farm*, the Defendants put at issue the question of potential harm, because those cases refer to such harm as part of the equation. Northwest further notes that, with regard to its arguments in the Superior Court as an appellee, it had no issue preservation responsibilities; therefore, the Defendants' attempted waiver argument fails. *Id.* at 47 n.16.

Next, Northwest refutes the Defendants' argument that the Superior Court created a new rule that potential harm should be considered in cases such as this one. Northwest contends that the Superior Court did not craft a new rule regarding potential harm; it merely applied this well-settled law. Concerning the Defendants' contention that potential harm was not a factor in this case because Northwest obtained a preliminary injunction enjoining First National from further gutting Northwest, Northwest argues that the Defendants cannot invoke its resistance to the takeover and business resilience to exculpate itself. Its ability to thwart the Defendants' scheme does not mean the "potential harm ratios cannot be calculated under *Gore* guidepost two and, in this case, the evidence was more than sufficient to establish the value of the potential harm [Northwest] would

have likely sustained, if [the Defendants'] scheme had succeeded." Northwest's Brief at 49-50; *see id.* at 46 n.15 ("According to expert testimony at trial, the *pro forma* analyses that FNB prepared prior to the raid regarding the financial benefits of only acquiring Turk and Collins and their books of business showed a value of $5.3 million. (R.R. 302a–303a). Calculating potential harm ratios using this figure representing a partial success of the entire scheme also yields ratios that are less than 1 to 1.").

B.   Analysis

In assessing the constitutionality of a punitive damages award, the United States Supreme Court first took account of the potential harm that might result from a defendant's tortious conduct in *Haslip*. The High Court endorsed the Alabama Supreme Court's standard of "whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred." *Haslip*, 499 U.S. at 21. The *TXO* plurality noted the High Court's previous endorsement of the potential harm standard:

> Thus, both State Supreme Courts and this Court have eschewed an approach that concentrates entirely on the relationship between actual and punitive damages. It is appropriate to consider the magnitude of the potential harm that the defendant's conduct would have caused to its intended victim if the wrongful plan had succeeded, as well as the possible harm to other victims that might have resulted if similar future behavior were not deterred.

*TXO*, 509 U.S. at 460.

Then in *Gore*, the Supreme Court granted certiorari to clarify "the character of the standard that will identify unconstitutionally excessive awards of punitive damages." *Gore*, 517 U.S. at 568 (citation omitted). As part of that standard, the High Court associated potential harm with its second guidepost: "the disparity between the harm or

potential harm suffered [by the plaintiff] … and [the] punitive damages award[.]" *Gore*, 517 U.S. at 575 (emphasis supplied). According to the *Gore* Court, potential harm refers to "the harm likely to result from a defendant's conduct as well as the harm that actually has occurred," or, stated otherwise, "the harm to the victim that would have ensued if the tortious plan had succeeded." *Id.* at 568 (quoting *TXO*, 509 U.S. at 460) (emphasis omitted). *See also Weinstein v. Prudential Property and Cas. Ins. Co.*, 233 P.3d 1221, 1256 (Idaho 2010) ("[P]otential harm refers to harm that may occur or could have occurred from the defendant's past wrongful conduct, not harm that could result from future similar wrongful conduct by the defendant or others if they are not deterred from engaging in that conduct.").

Although in *Leatherman* the Supreme Court was focused mainly on the correct standard of review in assessing the constitutionality of a punitive damages award, it again commented on potential harm as part of the second *Gore* factor, discussing potential harm in relation to a realistic evaluation of the record evidence. *See Leatherman*, 532 U.S. at 442 ("Even if that estimate [of potential harm] were correct, however, it would be unrealistic to assume that all of Cooper's sales of the ToolZall would have been attributable to its misconduct in using a photograph of a modified PST in its initial advertising materials."). The *TXO* plurality explained that the potential harm that is properly included in the due process analysis is "harm that is likely to occur from the defendant's conduct." *TXO*, 509 U.S. at 460.

In this case, the Superior Court never discussed the constitutionality of the single-digit ratios resulting from the per-defendant ratio calculation using the compensatory damages as the denominator in the equation. Instead, the Superior Court viewed the

evidence based on the totality of the takeover scheme and proceeded to consider the potential harm to Northwest in the calculation. *See The Bert Co.*, 257 A.3d at 128 ("Additionally, and critically in this case, the ratio guidepost is not **strictly** a compensatory-to-punitive damages question. Instead, that guidepost can also consider "**potential**" harm a plaintiff could have suffered due to the defendant's misconduct. *Gore*, 517 U.S. at 575[.]") (emphasis in original). After discussing the scope and intent of the scheme to takeover Northwest, the Superior Court identified what it believed to be the monetary amount of the potential harm intended by the Defendants ($9.4 million), then used that number as the denominator and concluded that the ensuing calculations resulted in ratios of less than 1 to 1, which were impervious to constitutional attack.

We have determined that the second *Gore* guidepost requiring an analysis of the relationship between the punitive damages award to the harm suffered by Northwest—as measured by the mathematical ratio of the punitive damages awards to the compensatory damages award—does not bump up against the single-digit ratio earmarked for concern in *State Farm*. However, as discussed, the calculation of the ratio is not the end of the analysis. The Defendants' argument in this Court against the Superior Court's consideration of the potential but unrealized harm to Northwest starts with the premise that the ratio must be calculated on a per-judgment basis. Applying that calculation results in an 11.2 to 1 ratio. Again, in a mechanical fashion, the Defendants posit that this ratio is presumptively unconstitutional, and the Superior Court's only reason for considering potential harm was to rationalize an otherwise presumptively unconstitutional punitive verdict. Even though the Defendants' argument is couched in an attack on a ratio calculation that we have rejected, whether potential harm has a place

in a jury's award of punitive damages remains relevant to the application of the second *Gore* factor.

First, the Defendants' contention that the Superior Court's "sua sponte" consideration of potential harm in its analysis of the second *Gore* factor was error demonstrates a misunderstanding of the de novo review required when a specific challenge is made to the unconstitutional excessiveness of a punitive damages award as required by *Leatherman*, 532 U.S. at 431. In the Superior Court, the Defendants challenged the punitive damages awards in light of the second *Gore* guidepost: the relationship of the punitive damages award to the harm or potential harm suffered by the victim. Its consideration of evidence of potential harm as part of its de novo review of the relationship between the punitive and compensatory damages awards was sound.

Second, contrary to the Defendants' assertion, evidence of record supports the calculation of potential harm intended by the Defendants. As detailed by the Superior Court and supplemented by our review of the record, the Defendants' scheme to gut Northwest of its personnel, capture the business of those employees, and force a fire sale of the remaining business was thwarted by Northwest through resistance and prompt legal action. The jury's compensatory damages award did not and could not capture the harm that was the goal of the Defendants' conduct and that was likely to result from their conduct. *TXO*, 509 U.S. at 460. At a minimum, the expert testimony established through the pro forma analysis prepared by FNIA to evaluate the acquisition of Turk and Collins and their books of business showed a value of $5.3 million over a five-year period. N.T., 12/17/2018, at 231–32. As described, this was just one aspect of the planned takeover. The Superior Court relied on the 2017 revenue of Northwest as verified by the testimony

of Mr. Bert at $9.4 million[48] to establish the amount of the potential harm intended by the Defendants if the scheme was successful. We are skeptical of the reliance on this raw point-in-time economic figure to reflect the amount of potential harm that "was likely to occur" from the Defendants' conduct. It is not only unrealistic but incorrect to assume that this figure, devoid of any consideration of the costs of doing business, represents the amount of potential harm. However, the jury was apprised of the harm likely to occur if only the first step of the plan was successful, i.e., "lifting out" Turk and Collins. We are satisfied that the jury was presented with sufficient evidence to consider the potential harm that was likely to occur from the Defendants' conduct.

Finally, the jury was instructed that in considering the award of punitive damages it could consider "any or all of the follow[ing] factors. … Two, the nature and extent of the harm to Plaintiff the Defendant caused or intended to cause." N.T., 12/20/2018, at 171. The trial court derived this language from well-established Pennsylvania law. The element of an award of punitive damages for averted harm has long been recognized in Pennsylvania. *Feld v. Merriam*, 485 A.2d 742 (Pa. 1984) (adopting Restatement (Second) of Torts § 908(2), which provides that jury can consider nature and extent of harm defendant caused or intended to cause); *Kirkbride*, 555 A.2d at 803 (citing *Feld* and Section 908(2) instruction on punitive damages); *SHV Coal, Inc. v. Continental Grain Co.*, 587 A.2d 702 (Pa. 1991) (same). The charge given by the trial court accurately reflects the concept of potential harm as articulated by the High Court and consistently applied in this Commonwealth. This case involved the commission of intentional torts, and the charge appropriately conveyed to the jury that it could award punitive damages for both

---

[48] N.T., 12/20/2018, at 206, 211.

the harm caused by the Defendants and the harm that they intended to inflict on Northwest if the scheme had been successful. The magnitude of the harm intended is a strong indicator of the maliciousness of the Defendants' conduct, and it is relevant in considering whether the *Gore* ratio is constitutionally acceptable.

Under the facts and circumstances of this case, the Superior Court did not err in considering potential harm in its de novo review of the relationship between the compensatory and punitive damages awards in this case. Although we reject its point of analysis for the amount of potential harm, using the described pro forma analysis as the potential harm likely to occur if the Defendants' scheme was not thwarted was a relevant factor to consider in analyzing the relationship between the punitive and compensatory damages awards.

However, we are not convinced that the appropriate treatment of the amount of potential harm is to mechanically add it to the amount of compensatory damages and then recompute the ratio under the second *Gore* factor. The magnitude of the potential harm that was intended by the Defendants in this case sheds light on the proportionality of the punitive to compensatory damages. The jury decided, appropriately based on the evidence, that punishment and deterrence were warranted because the goal of the entire scheme was to destroy a competitor without regard to the existing non-solicitation agreements and by way of months-long planning, surreptitious meetings, disruption of employment arrangements with newly hired employees, and timing the transfer of personnel to FNIA so that the key Northwest employee (who helped mastermind the scheme) was last to leave so that he could broker the fire sale of the remaining business of Northwest. We do not go so far as to say that the amount of the potential harm that

was likely to occur if the scheme had not been thwarted created a less than 1 to 1 ratio of punitive to compensatory damages. However, in light of the evidence that conservatively establishes a goal of $5.4 million of thwarted harm to Northwest, the ratios of punitive to compensatory damages ranging from 1.8 to 1 to 6 to 1 likely understate the actual proportion. Certainly, in a case where the ratio exceeds, to a significant degree, a single-digit ratio, consideration of the potential harm to the plaintiff that was likely to occur from a defendant's conduct is important and may be outcome determinative in judicial scrutiny of the award for purposes of the second *Gore* factor.

> **V.** **Whether, in cases where the compensatory damages award is substantial, a punitive-to-compensatory damages ratio exceeding 9:1 is presumptively unconstitutional under U.S. Supreme Court precedent?**

As discussed, the issues upon which we granted allowance of appeal were narrowly tailored to address the appropriate calculation of the ratio of punitive to compensatory damages required by *Gore*. *See* supra at p. 18. Having concluded that the appropriate methodology is the per-defendant approach, none of the resulting ratios applicable to the individual Defendants' punitive damages awards exceeds the single-digit ratio earmarked by the High Court in *State Farm* as potentially constitutionally suspect. *State Farm*, 538 U.S. at 425. The Defendants' argument regarding a ratio in excess of a single digit (i.e., the global ratio of 11.2 to 1) is moot in that it is based on a calculation of the ratio using the per-judgment approach. Although we have rejected the Defendants' preferred methodology, we find it prudent to address certain aspects of the Defendants' contentions because they interface with the general framework of the *Gore* ratio analysis.

A.     Arguments of the Parties

In arguing that the punitive to compensatory damages ratio in this case presumptively violates the Due Process Clause of the Fourteenth Amendment of the United States Constitution, the Defendants start from the premise that a per-judgment ratio of 11.2 to 1 is presumptively unconstitutional. The Defendants' Brief at 31 (citing *State Farm*, 538 U.S. at 425 ("[I]n practice, few awards exceeding a single-digit ratio between punitive damages and compensatory damages, to a significant degree, will satisfy due process.")). The Defendants consider the Pennsylvania appellate court precedent cited by the Superior Court, *Hollock v. Erie Insurance Exchange*, 842 A.2d 409 (Pa. Super. 2004), and *Grossi v. Travelers Personal Insurance Co.*, 79 A.3d 1141 (Pa. Super. 2013), to be exceptions to the single-digit cut-off of 9 to 1. They reason that, in those statutory bad faith actions, compensatory damages are limited to fees, expenses, and interest. As a result, an award of compensatory damages in such cases is relatively low, which, pursuant to federal precedent, may justify a higher ratio of punitive damages. In this case, however, the Defendants insist that the substantial award of $250,000 in compensatory damages does not justify the double-digit ratio of punitive to compensatory damages and that, instead, the amount of punitive damages should be at most equal to the compensatory damages award, i.e., 1 to 1.

In response, Northwest challenges the Defendants' characterization of the $250,000 award of compensatory damages as "substantial," highlighting that courts have characterized damages that far exceed that amount as "limited," "little," or "not substantial." Northwest's Brief at 42 (citing cases to establish that $250,000 is not substantial for purposes of assessing ratio). Northwest also rejects Defendants' assertion

that courts have held there is a presumptive constitutional ratio cutoff of 9 to 1. In support, Northwest highlights that the Supreme Court has consistently maintained that "there are no rigid benchmarks that a punitive damages award may not surpass." Northwest's Brief at 20-21 (quoting *State Farm*, 538 U.S. at 425). Indeed, Northwest urges, the Court "has stated flatly that the ratios discussed in *State Farm* 'are not binding.'" *Id.* at 41 (quoting *State Farm*, 538 U.S. at 425). Northwest argues there is no presumption that a double-digit ratio results in an unconstitutionally excessive award of punitive damages.

B.    Analysis

Although the *State Farm* Court opined that, "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee," it did not define "substantial" for purposes of evaluating compensatory damages. *State Farm*, 538 U.S. at 425. The question is, what is a "substantial" award.

The term "substantial" is not self-explanatory, and its meaning is not self-evident.[49] Does substantial have meaning only in relation to something else or is it merely the

---

[49]  As demonstrated by the parties' advocacy in this matter, for every case cited for the proposition that $250,000 in compensatory damages is a substantial award, a case can be cited for the proposition that $250,000 in compensatory damages is not a substantial award. For the proposition that a $250,000 award is substantial, the Defendants cite, inter alia, *Williams*, 947 F.3d at 755 (describing $250,000 as "not a small amount of money," where lost wages were in the $75,000 range), and *Schwigel v. Kohlmann*, 647 N.W.2d 362 (WI App. 2002) (overturning "substantial" compensatory award of $250,000 due to improper jury instructions on law of damages). On the other hand, for the proposition that a $250,000 award is not substantial, Northwest cites *Bullock v. Philip Morris USA, Inc.*, 131 Cal. Rptr.3d 382 (Cal. Ct. App. 2011) (describing $850,000 as "a small amount of economic damages"), and *Flax v. DaimlerChrysler Corp.*, 272 S.W.3d 521 (Tenn. Ct. App. 2008) (holding that $2.5 million compensatory damages award was not subject to *State Farm* ratio of 1 to 1 for substantial awards). This situation is not (continued…)

subjective conclusion about the size of the award, i.e., it is a big number? [50]  For example,

in *State Farm*, the Supreme Court concluded that a $1 million compensatory damages

award was substantial and complete compensation for a year and a half of emotional

distress.  *State Farm*, 538 U.S. at 426.  Certainly, what eighteen months of emotional

distress is worth to the victim suffering it is subjective, not objective.  While the *State Farm*

Court struck down the punitive verdict that rendered a 145 to 1 ratio for multiple reasons,

---

surprising because compensatory damages are fact-intensive; each case is decided on the evidence of harm presented to the jury.

We observe that the Defendants additional citation to *King v. GEICO Indemnity Co.*, 712 Fed. App'x 649 (9th Cir. 2017), as a "substantial" award case is misplaced.  Therein, the court did not use the term "substantial" at all, let alone to describe the compensatory damages awarded.  In calculating the ratio pursuant to the second *Gore* guidepost, the *King* Court simply calculated the ratio using the $266,070.61 compensatory damages award—without qualification—to assess whether the punitive damages award violated due process.  *Id.* at 650–51.

[50]  Commentators have recognized that some courts sideline the inquiry given the difficulty of determining if a compensatory award is substantial:

> If the Supreme Court intends 1:1 to represent a significant restraint on punitive damages in cases involving 'substantial' compensatory damages, that message is not being well received [as most courts] do not expressly consider the 'substantial' rationale at all.

> * * *

> Determining when compensatory awards are sufficiently substantial to limit the punitive damages to a 1: 1 ratio obviously depends heavily on how the reviewing court interprets the amount of the compensatory damages in relation to the facts of the case, particularly the degree of reprehensibility involved, and arguably interjects a disturbing degree of subjectivity into the review process.

Laura J. Hines & N. William Hines, Constitutional Constraints on Punitive Damages: Clarity, Consistency, and the Outlier Dilemma, 66 Hastings L.J. at 1302.

its predicate finding that the compensatory award was substantial deserves separate attention to demonstrate that the meaning of substantial is open to a variety of definitions and opinions on which reasonable minds might differ.

In a commercial tort or breach of contract action, for example, some courts have opined that the substantiality of a compensatory damages award has meaning in relation to the amount of damages demanded, which the plaintiff presents to the jury as a sum certain. *See*, *e.g.*, *Williams v. First Advantage LNS Screening Solutions Inc.*, 947 F.3d 735, 755 (11th Cir. 2020) (holding $250,000 award of compensatory damages was substantial where lost wages resulting from negligence of consumer reporting agency totaled $78,272). Other courts have used the degree of reprehensibility of the defendant's conduct to assess whether the compensatory damages award was substantial. *See Bullock v. Phillip Morris USA, Inc.*, 131 Cal. Rptr. 3d 382, 406 (Ct. App. 2011) (upholding $13.8 million punitive damages award where compensatory damages award was $850,000 "because of the extremely reprehensible degree of defendant's misconduct"), and *Flax v. DaimlerChrysler Corp.*, 272 S.W. 3d 521, 539 (Tenn. Ct. App. 2008) (upholding $13 million punitive damages award where compensatory damages award was $2.5 million because "a 1:1 ratio would [not] adequately punish or deter defendant's reckless conduct"). As we previously discussed, the amount of potential harm that was likely to result from a defendant's conduct compared to the actual damages awarded is a relevant factor in determining whether a compensatory damages award is substantial.

Given the multitude of factors that might influence a determination of whether a compensatory damages award is or is not substantial, the Defendants' contention that the dollar amount of an award alone suggests the answer is misplaced. Like the other

inquiries inherent in the second *Gore* factor, the determination of substantiality of an award is based on the totality of the circumstances.

Again straining for mathematical certainty, the Defendants' argue that a ratio of punitive to compensatory damages higher than 9 to 1 is presumptively unconstitutional. United States Supreme Court precedent does not lend itself to such a doctrinaire assertion. The overall concern of the United States Supreme Court in limiting the discretion-based common-law approach to the assessment of punitive damages was to curtail punitive awards that "run wild" and offend "judicial sensibilities," *Haslip*, 499 U.S. at 18, or that amount to an arbitrary deprivation of property in violation of due process, *TXO*, 509 U.S. at 453–54.[51] The High Court "rejected the notion that the constitutional line [of excessiveness] is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award." *Gore*, 517 U.S. at 582. In fact, the Court has remarked that "[i]n most cases, the ratio will be within a constitutionally acceptable range, and remittitur will not be justified on this basis." *Id.* at 583.

Even taking into account the High Court's observation that a 4 to 1 ratio "might be close to the line of constitutional impropriety," *State Farm*, 538 U.S. at 425, we cannot escape the Court's steadfast refusal to create a bright line for delineating excessive

---

[51] The only presumption related to punitive damages grounded in federal jurisprudence is that, if "fair procedures were followed, a judgment that is the product of that process is entitled to a strong presumption of validity." *TXO*, 509 U.S. at 457. The Defendants have not complained that fair procedures were not followed in this case; therefore, the jury's punitive verdict is entitled to a strong presumption of validity.

punitive awards. The fact is that—by definition—a guidepost is an "indication, sign,"[52] and is meant to direct courts toward a line of reasonableness, not dictate where the line is.[53] There is no bright line because being close to the line is not synonymous with crossing it, let alone crossing it to the point of offending constitutional principles. According to the Supreme Court, the ratio of punitive damages to compensatory damages is "instructive," not binding, and the limits of a constitutionally acceptable ratio are defined by the facts of a particular case. *Gore*, 517 A.2d at 583; *see also State Farm*, 538 U.S. at 425 ("The precise award in any case … must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff.").

While the *State Farm* Court also observed that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process," *State Farm*, 538 U.S. at 425, again the High Court did not explain what it meant by "a significant degree." Nor did it say that if a ratio exceeds single digits beyond that nebulous degree, it is unconstitutional. Rather, we view the observation to mean at most that such a ratio requires a closer examination of the justification for the punitive damages award. Borrowing a phrase from another context, a court should "raise a suspicious judicial eyebrow" at a punitive damages award that does not bear a reasonable relationship to the harm. *TXO*, 509 U.S. at 481 (O'Connor, J., dissenting). At

---

[52] "Guidepost." Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/guidepost. Accessed 15 Feb. 2023.

[53] Justice O'Connor recognized that, "although it might be convenient to establish a multipart test and impose it upon the States, the principles of federalism counsel against such a course. The States should be permitted to 'experiment with different methods' of ferreting out impermissible awards 'and to adjust these methods over time.'" *TXO*, 509 U.S. at 483 (O'Connor, J., dissenting).

bottom, a punitive damages award that exceeds a single-digit ratio to a "significant degree" may trigger judicial suspicion, not a presumption of unconstitutionality.[54]

**Conclusion**

In this appeal involving a challenge based on the alleged unconstitutional excessiveness of punitive damages awards against multiple defendants, we granted discretionary review to consider the appropriate ratio calculation that is part of the due process analysis contemplated by the second guidepost articulated in *Gore* and further refined in *State Farm*: the relationship of the punitive verdict to the harm or potential harm suffered by the victim. *Gore*, 517 U.S. at 575; *State Farm*, 538 U.S. at 425. We adopt the per-defendant approach to calculate the ratio, where the punitive damages award is the numerator and the compensatory damages award is the denominator. This methodology reflects the impact of the punitive verdict on each of the Defendants as required under the Due Process Clause.

Based on the agreement of the parties in this case, a jury entered a single compensatory damages award against the Defendants who were jointly and severally liable to the plaintiff, Northwest. The jury entered separate punitive damages awards against each of the Defendants in varying amounts. Although the jury was not instructed to allocate responsibility among the Defendants for the harm caused to Northwest, we conclude that the per-defendant methodology is appropriate. The calculation for each of the Defendants includes the total compensatory damages award as the denominator and

---

[54] In *Gore*, the Supreme Court described a ratio of 500 to 1 as "breathtaking" and one that "must surely 'raise a suspicious judicial eyebrow,'" but not as presumptively unconstitutional. *Gore*, 517 U.S. at 483 (quoting *TXO*, 509 U.S. at 481 (O'Connor, J., dissenting)).

the individual punitive damages awards as the numerator. This methodology for calculating the ratio in this case reflects the instruction to the jury that the harm to Northwest was indivisible and stays true to both the purpose of assessing the Defendants' individual due process rights and joint and several liability principles incorporated by the parties into the verdict.

In addition, the second *Gore* guidepost anticipates consideration of the potential harm likely to occur from the Defendants' conduct. Where, as here, the record includes evidence of the potential harm intended by the Defendants and the jury was instructed that such harm could be considered in its award of punitive damages, the Superior Court did not err in considering the amount of potential harm as part of its consideration of the relationship between the punitive damages awards and the compensatory damages award. While the value of the potential harm is not directly added to the compensatory damages award to create a new denominator in the ratio, it is a relevant factor to consider in evaluating whether a punitive damages award is excessive.

In the absence of any other basis to review the constitutionality of the punitive damages awards based on the scope of our allowance of appeal, we affirm the order of the Superior Court.

Chief Justice Todd and Justices Dougherty and Wecht join the opinion.

Justice Dougherty files a concurring opinion.

Justice Wecht files a concurring opinion.

Justice Mundy files a concurring opinion.

Justice Brobson files a concurring opinion.